**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 2 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CHASE BRYANT and CHARLES
BRYANT,

     Plaintiffs-Appellants,

v.

INDEPENDENT SCHOOL DISTRICT
NO. I-38 OF GARVIN COUNTY,
OKLAHOMA, also known as
Wynnewood Public Schools,

     Defendant-Appellee.

No. 02-6212

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 01-CIV-375-C)

---

Garvin A. Isaacs (Nancy A. Zerr with him on the briefs) of Garvin A. Isaacs, Inc.,
Oklahoma City, Oklahoma, for Plaintiffs-Appellants.

Frederick J. Hegenbart (Jerry A. Richardson with him on the brief) of Rosenstein,
Fist & Ringold, Tulsa, Oklahoma, for Defendant-Appellee.

---

Before **TACHA**, Chief Circuit Judge, **McKAY** and **HENRY**, Circuit Judges.

---

**McKAY**, Circuit Judge.

Chase and Charles Bryant brought this action in the District Court for the Western District of Oklahoma pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, (1994), alleging violations of their civil rights. The Bryants appeal the United States District Court Order granting summary judgment in favor of Independent School District No. I-38 of Garvin County, Oklahoma ("the School District").

Appellants were students at Appellee School. As a result of their participation in two separate fights during the Spring 2000 term, the School suspended Appellants for the remainder of the semester. In the district court, Appellants stated three claims for relief: (1) the School District intentionally discriminated against them on the basis of race for participating in the February 8, 2000, fight (by suspending Appellants for the remainder of the school year); (2) the School District used a neutral procedure or practice (the "Fight Policy") that had a disparate impact on them because they are African Americans; and (3) the School District created and contributed to a racially hostile educational environment prior to the February 8, 2000, fight.

The district court granted summary judgment for the School District because (1) Appellants failed to raise a factual dispute regarding the intentional discrimination allegation and (2) the Supreme Court's holding in Alexander v. Sandoval, 532 U.S. 275 (2001), established that Title VI prohibits only intentional

discrimination, and, therefore, there is no private right of action under Title VI to remedy non-intentional forms of discrimination such as disparate impact and permitting the existence of a hostile environment.

Appellants raise three issues on appeal: (1) whether there is a genuine issue of material fact regarding whether the School District intentionally discriminated against Appellants on the basis of race for participating in the February 8, 2000, fight; (2) whether the trial court erred in holding that Appellants' claims of disparate impact racial discrimination fail because of reliance upon a federal regulation promulgated under § 602 of Title VI; and (3) whether the trial court erred in determining that Title VI does not provide a private right of action or remedy for a racially hostile educational environment.

We review a district court's grant of summary judgment *de novo*. <u>Reynolds v. School Dist. No. 1, Denver, Colo.</u>, 69 F.3d 1523, 1531 (10th Cir. 1995). A motion for summary judgment is granted when the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The first two issues raised by Appellants stem from the February 8, 2000, fight which resulted in Appellants' suspension for the remainder of the Spring 2000 semester. Because this is a "discharge" case, we must first apply the burden-shifting paradigm found in <u>Texas Department of Community Affairs v.</u>

<u>Burdine</u> to determine whether Appellants can withstand summary judgment. 450

U.S. 248 (1981).[1]  The basic allocation of burdens in a Title VI case is as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for [the discharge].  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

<u>Burdine</u>, 450 U.S. 248, 252-53 (1981) (internal quotations and citations omitted);

<u>see</u> <u>also</u> <u>Guardians Ass'n v. Civil Serv. Comm'n of New York</u>, 463 U.S. 582

(1983) (courts often use Title VII proof scheme for Title VI claims).

Appellants set forth a prima facie case of discrimination.  They alleged that

they were suspended after the February 8, 2000, fight while Caucasian students

who participated in the fight were not suspended.

The School District rebutted the presumption of discrimination by showing

that Appellants were the only students involved in the fight that had violated the

prohibition against fighting for the second time during the Spring 2000 semester.

Pursuant to the Fight Policy which states that "[f]ighting, forcing another student

---

[1]Courts often use Title VII proof scheme for Title VI claims.  <u>Guardians Ass'n v. Civil Serv. Comm'n of New York</u>, 463 U.S. 582 (1983).

to fight to defend himself, and physically attacking another student cannot be tolerated," students guilty of a second offense are expelled for the balance of the current semester. Rec., Vol. I, at 57. Additionally, Appellee demonstrated that the School has consistently suspended all students that were involved in two fights over the course of the same semester as Appellants were in this case. Of approximately ten students that have been involved in two or more fights in the same semester over the past ten years, four were African American (including Appellants) and six were Caucasian. All were suspended.

We agree with the district court that Appellees adequately demonstrated that the decision to suspend Appellants was free from any discriminatory intent or purpose. As such, Appellants were required to offer evidence that could support a finding that the School's reasons for suspending them were pretextual. Our review of the record reveals that Appellants failed to raise a factual dispute regarding this allegation. Therefore, we hold that the district court did not err in finding no genuine issue of material fact regarding whether the School District intentionally discriminated against Appellants on the basis of race for participating in the February 8, 2000, fight.

We further hold that because Appellants' disparate-impact claim stems from their suspensions for participating in the February 8, 2000, fight, Appellants did not meet their burden of "prov[ing] by a preponderance of the evidence that

the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. 248, 253 (1981). Because we hold that Appellants did not meet their burden, we need not address whether Appellants' disparate-impact claim is foreclosed by Sandoval.

We finally address whether the trial court erred in determining that Title VI does not provide a private right of action or remedy for a racially hostile educational environment. Because we are reviewing a grant of summary judgment, we must construe all facts and reasonable inferences in favor of the non-moving party. Reynolds, 69 F.3d at 1531.

The hostile environment claim centers on events which occurred prior to the February 8, 2000, fight. The claim does not derive from the fight itself or the suspensions resulting therefrom. In support of the hostile environment allegation, Appellants claim that the School allowed the presence of offensive racial slurs, epithets, swastikas, and the letters "KKK" inscribed in school furniture and in notes placed in African American students' lockers and notebooks. Additionally, Appellants claim that Caucasian males were allowed to wear T-shirts adorned with the confederate flag in violation of the dress code prohibiting offensive and disruptive clothing. Appellants further claim that, even though the School was aware of the hostile environment because of complaints by students and parents, it did nothing to remedy the situation prior to the February 8, 2000, fight.

Title VI protects the right to be free from discrimination under a program that receives federal funding. 42 U.S.C. § 2000d. Title VI provides in part that "[n]o person . . . shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or subjected to discrimination under any program or activity receiving Federal financial assistance." Id. Section 601 prohibits intentional discrimination based on race, color, or national origin in covered programs and activities. Sandoval, 532 U.S. at 276. Section 602 authorizes federal agencies to effectuate § 601 by issuing rules, regulations, or orders of general applicability which are consistent with achieving the objectives of the statute. Id. at 288-89.

Section 601 prohibits only instances of intentional discrimination. Id. at 281. The Supreme Court has held that Congress intended to provide a private cause of action for individuals to enforce § 601. Id. at 280. Section 602, however, does not provide a private right of action to enforce or challenge rules or regulations promulgated under that section. Id. at 293. In Sandoval, the Court stated that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists." Id.

Since only § 601 provides a private right of action and since the only types

of discrimination that § 601 prohibits are instances of intentional discrimination, the question in this case is whether the allowance of a hostile environment can ever be "intentional." We are aware of no reported cases that have directly addressed the viability of a racially hostile environment claim in Title VI cases in light of Sandoval's direction that there is only a private right of action for intentional discrimination. Sandoval itself dealt with the alleged disparate impact of Alabama's English-only driver's license examination. The Sandoval Court specifically dealt with disparate-impact discrimination under § 602 of Title VI. Id. The scope of that decision, therefore, must be read in light of the complete lack of an intentional act. Pryor v. National Collegiate Athletic Ass'n, 288 F.3d 548 (3d Cir. 2002), a decision interpreting Sandoval, similarly dealt with a facially neutral policy that allegedly had a disparate impact on certain minorities. Because Sandoval and Pryor did not address claims of a hostile environment, they provide limited guidance in our case.

Monteiro v. The Temple Union High School District, 158 F.3d 1022 (9th Cir. 1998), a case heavily relied upon by Appellants, is also of limited relevance because it was decided before the Supreme Court's decision in Sandoval. In Monteiro, the Ninth Circuit relied on regulations promulgated by the Department of Education to hold that allegations of a hostile racial educational environment stated a claim under § 602 of Title VI. Since Sandoval holds that there is "no

private right of action to enforce regulations promulgated under § 602," Monteiro is no longer good law. That said, we do find some guidance in the principles and reasoning underlying that decision. "[V]erbal harassment of a young child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would on an adult." Id. at 1034 (quoting 59 Fed. Reg. 11449 (1994)). Additionally,

> [i]t does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.

Monteiro, 158 F.3d at 1034. We agree that "[a] school where this sort of conduct occurs unchecked is utterly failing in its mandate to provide a nondiscriminatory educational environment." Id.

We must stress that this is not merely a case of disparate impact. If it were, Sandoval might foreclose a private cause of action. But see Sandoval, 532 U.S. at 298 (Stevens, J., dissenting) ("to the extent that the majority denies relief to the respondents merely because they neglected to mention 42 U.S.C. § 1983 in framing their Title VI claim, this case is something of a sport. Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference § 1983 to obtain relief; indeed, the plaintiffs in this case (or other similarly situated individuals) presumably retain the option of

-9-

re-challenging Alabama's English-only policy in a complaint that invokes § 1983 even after today's decision."). In disparate impact cases, there is no intent to act or not act at all. Disparate impact cases usually deal with facially neutral policies and procedures that, when applied, have an unintentional discriminatory *effect* on certain individuals based on their race, color, or national origin.

This is a case where students, and possibly teachers, intentionally acted in a racially discriminatory way toward other students.[2] This is a case where the principal was aware of the racial slurs, graffiti inscribed in school furniture, and notes placed in students' lockers and notebooks. This is a case where Caucasian males were allowed to wear T-shirts adorned with the confederate flag, swastikas, KKK symbols, and hangman nooses on their person and their vehicles. This is a case where students and parents complained to the principal about the racist environment and the principal did not attempt to remedy the situation. The principal affirmatively chose to take no action.[3]

Choice implicates intent. It is inapposite that a court could hold that

---

[2]These are the facts as alleged by Appellants. Since we are at the summary judgment stage, we must assume the facts as adequately alleged by the non-moving party are true. The veracity of these alleged facts will be tested at trial.

[3]The record suggests that the principal did not begin to take affirmative steps to remedy the instances of discrimination until after the February 8, 2000, fight. Rec., Vol. I, at 38, 104-06, 116, 135, 138, 140-43, 169. The complaint clearly frames the hostile environment claim as the time period leading up to the fight.

maintenance of a hostile environment is never intentional. Such a broad holding would permit school administrators to sit idly, or intentionally, by while horrible acts of discrimination occurred on their grounds by and to students in their charge. School administrators are not simply bystanders in the school. They are the leaders of the educational environment. They set the standard for behavior. They mete out discipline and consequences. They provide the system and rules by which students are expected to follow. As stated by Superintendent Jim Stark in his affidavit, "[m]aintaining order and a positive educational environment in a school is essential." Rec., Vol. I, at 64.

We are not necessarily holding that school administrators have a duty to seek out and discover instances of discrimination or risk being held liable for intentional discrimination under § 601. However, we are holding that when administrators who have a duty to provide a nondiscriminatory educational environment for their charges are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable under § 601. Students and parents complained to the teachers and the principal at the School regarding "shameful student-to-student conduct which, if proven, could be fairly characterized as racist and prejudicial." Rec., Vol. I, at 303. The school administrators did not necessarily create the hostile environment. However, from the facts as alleged in the record, it appears that they might have

facilitated the hostile environment or, in the least, permitted it to continue.

The key inquiry for the Sandoval Court was whether the discrimination was intentional or unintentional. As our discussion reveals, the question of intent in a hostile environment case is necessarily fact specific. We must ascertain whether Appellee School and its administrators intentionally discriminated against Appellants. It is impossible to discern at the summary judgment stage whether the principal and administrators of Appellee School intentionally allowed and nurtured the racially hostile environment to the boiling point of the February 8, 2000, fight. It is for the trier of fact to determine if the principal and administrators truly had notice of the "shameful student-to-student conduct which, if proven, could be fairly characterized as racist and prejudicial." Rec., Vol. I, at 303. The question is whether the events and inaction in this case reached a point where it can be fairly said that the principal and administrators acted intentionally.

In summary, we hold that Appellants have set forth facts which, if believed, would support a cause of action for intentional discrimination for facilitating and maintaining a racially hostile educational environment prior to the February 8, 2000, fight. However, we also hold that the district court did not err in granting summary judgment to Appellees on whether the School District intentionally discriminated against Appellants on the basis of race by suspending them for

participating in the February 8, 2000, fight and on Appellants' disparate-impact claim.[4]

On remand, the district court is instructed to apply the test from <u>Davis v. Monroe County Board of Education</u> where the Supreme Court determined that, in certain circumstances, "deliberate indifference to known acts of [student-on-student] harassment" can constitute "an intentional violation of Title IX, capable of supporting a private damages action." 526 U.S. 629, 633 (1999). At issue in <u>Davis</u> was whether Title IX adequately notified recipients of federal funds that they might be subject to liability on a deliberate indifference theory. The Court held that notice was adequate. <u>Id.</u> at 634-45. The Court's reasoning in <u>Davis</u> guides our resolution of the instant case because Congress based Title IX on Title VI; therefore, the Court's analysis of what constitutes intentional sexual discrimination under Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI (and vice versa). <u>See</u> <u>Sandoval</u>, 532 U.S. at 279-80; <u>Cannon v. University of Chicago</u>, 441 U.S. 677, 694-95 (1979).

Because deliberate indifference to known instances of student-on-student racial harassment is a viable theory in a Title VI intentional discrimination suit,

---

[4]However, assuming Appellants prevail on the merits, we take no position at this time on whether the suspension, as a consequence of the alleged racially hostile environment, can be taken into account in the assessment of damages.

the Supreme Court's articulation of the test for making an evidentiary showing to prove such a theory is instructive. We have previously recognized the Supreme Court's holding in Davis and interpreted the four-part standard necessary to sustain a Title IV deliberate indifference claim. See Murrell v. School Dist. No. 1, Denver, Colo., 186 F.3d 1238 (10th Cir. 1999). In Murrell, we articulated the four-part test: "[T]he plaintiff must allege that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." Id. at 1246 (internal citation omitted and emphasis supplied). On remand, the district court is directed to apply to the Plaintiffs' Title VI deliberate indifference claims the standard for a Title IX deliberate indifference claim as previously articulated and applied by the Supreme Court in Davis and in this court's sole application of Davis's deliberate indifference test in Murrell.

For the foregoing reasons, the decision of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for proceedings consistent with this opinion.

**02-6212, Bryant v. Independent School District No. I-38 of Garvin County, Oklahoma**

**TACHA**, Chief Circuit Judge, concurring.

I concur in the judgment. This case presents the question of whether a principal's deliberate indifference to known incidents of student-on-student racial harassment can constitute intentional discrimination under § 601 of Title VI and thereby ground a private suit for damages against a school district receiving federal funds. I agree with the majority that, in certain circumstances, it can. I also agree that plaintiffs have alleged facts sufficient to – narrowly – survive summary judgment.

I write separately for two reasons. First, the district court erred in its application of *Sandoval* to the plaintiffs' theory of liability, which relied upon evaluative criteria set forth in a regulation promulgated pursuant to § 602. Because I think it important to clarify the relationship between such regulations and the private right of action under § 601, I begin with a brief discussion of *Sandoval* and its interaction with the Court's prior holding in *Davis*. Second, I write separately to emphasize to the district court that *Davis* painstakingly limits the range of facts that, if proved, will support a finding of liability and an award of damages under this theory.

    A.    *Section § 601 Creates a Private Right of Action to Enforce Title VI's Prohibition on Intentional Discrimination.*

In *Alexander v. Sandoval*, the Supreme Court reaffirmed that it is "beyond

dispute that private individuals may sue to enforce § 601" of Title VI and obtain both damages and injunctive relief. 532 U.S. 275, 280 (2001). "[I]t is similarly beyond dispute . . . that § 601 prohibits only intentional discrimination." *Id.* The Court went on to hold that, in contrast, § 602, which authorizes federal agencies "to effectuate the provisions of [§ 601] . . . by issuing rules, regulations, or orders of general applicability," neither expressly nor impliedly creates a freestanding private right of action to enforce such regulations. *Id.* at 288-93 (quoting 42 U.S.C. § 2000d-1). That is not to say, however, that regulations promulgated under § 602 may never invoke the private right of action that exists to enforce § 601. Rather, the Court merely held that § 601, which only prohibits *intentional* discrimination, determines the availability of a private right of action:

> Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.

*Id.* at 291 (internal citations and quotation marks omitted).

In this case, because plaintiffs' hostile environment claim "rel[ied] heavily upon evaluative criteria established by a Department of Education regulation

promulgated pursuant to § 602,"[1] the district court concluded that

> Plaintiffs' claim that the school district has permitted the existence of a racially hostile environment in violation of Title VI must . . . fail. Since this claim is for non-intentional discrimination under title VI, which is permissible under § 601, by necessity it must arise under § 602. Therefore, it may not be remedied by a private right of action.

Dist. Ct. Order at 7-8. The district court correctly determined that § 601 – and only § 601 – creates a private right of action, and that this action may enforce only § 601's prohibition on intentional discrimination. In granting the school district's motion for summary judgment on these grounds, however, the district court erred in two respects. First, it was error to hold that plaintiffs' reliance on the evaluative criteria set forth in the regulation mandated summary judgment in favor of the school district. As the foregoing discussion of *Sandoval* demonstrates, language in a regulation promulgated under § 602 may invoke the private right of action created by § 601. Thus, the question in all cases remains whether a plaintiff's complaint states a cognizable claim for intentional discrimination, not whether it relies on a § 602 regulation for an articulation of the circumstantial evidence the plaintiff offers to support her private action. Second, as discussed *infra*, the district court erred in determining that deliberate indifference to a racially hostile environment could not constitute intentional

---

[1] *Racial Incidents and Harassment Against Students at Educational Institutions: Investigative Guidance*, 59 FED. REG. 11448 (March 10, 1994).

discrimination under § 601.

B.     *"Deliberate Indifference" to Known Acts of Discrimination Can Constitute Intentional Discrimination Under Title VI.*

While *Sandoval* sets forth the test for determining whether a statute implies a particular private right of action, we are not called upon in this case to consider – as a matter of first impression – whether Title VI can ever support a private right of action for deliberate indifference to a racially hostile environment.

Two years before *Sandoval*, in *Davis v. Monroe County Board of Education*, the Supreme Court determined that, in certain circumstances, "deliberate indifference to known acts of [student-on-student] harassment" can constitute "an intentional violation of Title IX, capable of supporting a private damages action."[2]  526 U.S. 629, 633 (1999).   *See also Murrell v. School Dist.*

_____

[2] At issue in *Davis* was whether Title IX adequately notified recipients of federal funds that they might be subject to liability on a deliberate indifference theory.

> [P]rivate damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue.  When Congress acts pursuant to its spending power, it generates legislation much in the nature of a contract:  in return for federal funds, the States agree to comply with federally imposed conditions.  In interpreting language in spending legislation, we thus insist that Congress speak with a clear voice, recognizing that there can, of course, be no knowing acceptance of the terms of

(continued...)

-4-

*No. 1, Denver, Colo.*, 186 F.3d 1238, 1245-46 (10th Cir. 1999) (applying *Davis* to

hold that deliberate indifference to known instances of sexual harassment can

support liability under Title IX). The Court's reasoning in *Davis*, and ours in

*Murrell*, guide our resolution of the instant case because, as the Court has pointed

out more than once, Congress based Title IX on Title VI. Thus, the Court's

analysis of what constitutes intentional sexual discrimination under Title IX

directly informs our analysis of what constitutes intentional racial discrimination

under Title VI (and vice versa). *See Sandoval*, 532 U.S. at 279-80; *Cannon v.*

*Univ. of Chicago*, 441 U.S. 677, 694-95 (1979) ("Title IX was patterned after

Title VI . . . . Except for the substitution of the word 'sex' in Title IX to replace

the words 'race, color, or national origin' in Title VI, the two statutes use

identical language to describe the benefitted class."); *see also Jackson v.*

*Birmingham Bd. of Educ.*, 309 F.3d 1333, 1339 (11th Cir. 2002) ("Because we . . .

read Titles VI and IX *in pari materia*, *Sandoval*'s interpretation of Title VI

powerfully informs our reading of Title IX."). Because deliberate indifference to

known instances of student-on-student racial harassment is a viable theory in a

---

[2](...continued)
the putative contract if a State is unaware of the conditions imposed
by the legislation or is unable to ascertain what is expected of it.

*Davis*, 526 U.S. at 640 (quoting *Pennhurst State School and Hosp. v. Halderman*,
451 U.S. 1, 17 (1981)) (internal citations, alterations, and quotation marks
omitted). The Court held that notice was adequate. *Id.* at 634-45.

-5-

Title VI intentional discrimination suit, I consider it important to discuss the standards that guide our disposition of the instant motion and which, in my judgment, must guide the district court's inquiry on remand.[3]

>   C.   *The Test: (1) Did Student-on-Student Conduct at Plaintiffs' School Constitute a Racially Hostile Educational Environment, to Which (2) Defendant Was Deliberately Indifferent?*

Plaintiffs in this case allege that Principal Jackson was deliberately indifferent to known and pervasive acts of student-on-student racial harassment. Properly phrased, then, the question before us – which we have answered in the affirmative – is whether, in response to defendants' Rule 56 motion, plaintiffs have pointed to genuine issues of material fact as to the existence of a racially hostile environment at their school, to which Principal Jackson was deliberately indifferent. In answering this question, the Supreme Court's analysis in *Davis* determines what facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (when considering whether a genuine issue of material fact exists, "the substantive law will identify which facts are material").

---

[3] For understandable reasons, defendant relies on *Pryor v. NCAA* for the proposition that "applying [a] 'deliberately indifferent' standard to a Title VI purposeful-discrimination case" would "eviscerate the Supreme Court's ruling in [*Sandoval*]" and "turn [*Sandoval*] on its head." 288 F.3d 548, 568 (3d Cir. 2002). Because I find the *Pryor* panel's reasoning irreconcilable with *Davis*, defendant's reliance is, in my judgment, misplaced.

-6-

In *Murrell*, we interpreted *Davis* as setting forth four factors a plaintiff must allege to state a Title IX claim against a school district under the deliberate indifference theory:

> She must allege that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school. This limited rule imposes liability only on those school districts that choose to ignore Title IX's mandate for equal educational opportunities.

*Murrell*, 186 F.3d at 1246.

In applying this test to plaintiffs' hostile environment claim in this case, the district court on remand must remain mindful of the Court's guidance as to when harassment constitutes a hostile environment and when mere inaction constitutes deliberate indifference. As *Murrell* indicates, the standard set forth by the *Davis* Court, which must guide the district court's inquiry on remand into whether defendant's alleged failure to act subjected plaintiffs to a "racially hostile environment," is quite high:

> [F]unding recipients are properly held liable in damages only where they are deliberately indifferent to *[racial] harassment*, of which they have actual knowledge, *that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school*.

*Id.* at 650 (emphasis added). The following principles, articulated by the *Davis*

court, must guide the district court's inquiry into whether Principal Jackson's alleged failure to act rose to the level of "deliberate indifference" and thereby constituted intentional discrimination under § 601:

> [F]unding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment *only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. . . . [T]he recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable.* This is not a mere "reasonableness" standard. . . . In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.

*Id.* at 648-49 (emphasis added).

As the foregoing language demonstrates, the Court's discussion – of both the elements constituting a hostile environment and the degree of egregiousness necessary to elevate inaction to "deliberate indifference" – is replete with qualifications, caveats, and modifiers, to which the district court must remain attentive.[4]  As the dissent in *Davis* pointed out, "[t]he string of adjectives the

---

[4] *See id.* at 644-53.  In formulating its standards for "deliberate indifference" and "hostile environment," the Court noted, *inter alia*, the following factors limiting the circumstances in which a funding recipient may be held liable on this theory.  First, the statutory language and the deliberately indifferent standard combine to "narrowly circumscribe" the set of *parties* whose behavior can subject the funding recipient to liability.  For the deliberate indifference theory to be available under Title IX, the funding recipient must have "some control over the alleged harassment" and the "authority to take remedial action." *Id.* at 644 (citations omitted).  Second, the language of the statute, combined with the requirement that funding recipients have notice of their potential liability, also

(continued...)

majority attaches to the word 'harassment' [does not] narrow the class of conduct that can trigger liability" in such a way as to make resolution of such cases simple.[5] I nonetheless discern in the number and complexion of those modifiers at least one clear message: the compass of facts supporting liability under the deliberate indifference theory is narrow and heavily qualified. *See id.* at 644-53.

D. *Conclusion*

As I have pointed out, we remand because genuine issues of material fact exist as to whether pervasive student-on-student racial harassment at the school gave rise to a hostile educational environment and whether the remedial action, or lack thereof, taken by Principal Jackson constituted deliberate indifference. Maj.

---

[4](...continued)
"cabins the range of misconduct that the statute proscribes. . . . [A funding recipient's] deliberate indifference must, at a minimum, '*cause* [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 644-45 (citations omitted) (emphasis added). Third, because the harassment must occur "'under' 'the operations of' [the] funding recipient, the harassment must take place in a *context* subject to the school district's control." *Id.* at 645 (internal citations omitted) (emphasis added). Fourth, the Court also expressed concern that school administrators should "continue to enjoy the flexibility they require" to perform their jobs. *Id*. at 648.

A determination of whether particular conduct satisfies these factors "'depends on a constellation of surrounding circumstances, expectations, and relationships.'" *Id.* at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). Finally, the Court cautioned that "[p]eer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." *Id.* at 653.

[5] *Davis*, 526 U.S. at 678 (Stevens, J., dissenting).

op., *supra* at 10 & n.3 (citing the record). In particular, there is a question as to whether Principal Jackson's response *prior* to the February 8, 2000, fight met the standard set forth in *Davis*.[6] Thus, on remand, the district court must determine whether Principal Jackson's actions before the fight were "clearly unreasonable" in light of known circumstances, such that they subjected plaintiffs to an educational environment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school."

Deanell Reece Tacha,

Chief Circuit Judge

---

[6] Plaintiffs concede that race relations after the fight have improved significantly as a result of Principal Jackson's intervention.