Ela C. ALMENDARES,
et al., Plaintiffs

v.

Isaac PALMER, et al., Defendants

No. 3:00CV7524.

United States District Court,
N.D. Ohio,
Western Division.

July 23, 2003.

Mark R. Heller, Victor L. Goode, W. David Koeninger, Advocates for Basic Legal Equality, Toledo, OH, for Maria G. Rodriguez, and all others similarly situated, Consuelo Marquez, and all others similarly situated, Ela C. Almendares, And all others similarly situated, Tomas G. Juvier, And all others similarly situated, Maria Neria, And all others similarly situated, Jesus Saenz, And all others similarly situated, Plaintiffs.

John A. Borell, Office of the Prosecuting Attorney, Lucas County, Toledo, OH, for George Steger, Lucas County Dept. of Job and Family Services, defendants.

Rebecca L. Thomas, John T. Williams, Patrick W. Beatty, Office of the Attorney General, Health & Human Services Section, Columbus, OH, for Jacqueline Romer–Sensky, in her official capacity as Director of the Ohio Department of Job and Family Services, Ohio Department of Job and Family Services, Isaac Palmer, Tom Hayes, defendants.

## ORDER

CARR, District Judge.

Plaintiffs Ela C. Almendares, Tomas G. Juvier, Maria Neria, and Jesus Saenz bring this class action on behalf of themselves and others similarly situated against the Lucas County Department of Job and Family Services (LCDJFS) and Isaac Palmer in his official capacity as director of LCDJFS (county defendants), and the Ohio Department of Job and Family Services (ODJFS) and Tom Hayes in his official capacity as director of the ODJFS (state defendants). Plaintiffs claim defendants have violated federal and state law by failing to ensure the adequate provision of bilingual services under the state food stamp program. Plaintiffs also allege defendants intentionally discriminated against them on the basis of national origin. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

Pending are state and county defendants' motions for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the following reasons, state defendants' motion shall be denied and county defendants' motion shall be granted in part and denied in part.

## BACKGROUND

### I. Factual Background

Plaintiffs are low-income Spanish-speaking, or "limited English proficient" ("LEP"), recipients of food stamps. They are residents of Lucas County, Ohio. Their food stamps are administered by the LCDJFS.

Plaintiffs contend that notices, applications, and written communications from the ODJFS and LCDJFS are almost exclusively in English. Plaintiffs further allege that the LCDJFS does not have employees available who are able to speak to plaintiffs in Spanish. As a result of defendants' failure to implement bilingual policies, plaintiffs charge that their rights to participate equally in the federal food stamp program have been denied and that

defendants have discriminated against them on the basis of national origin.[1]

Plaintiffs' complaint asserts six causes of action. Count one, brought under 42 U.S.C. § 1983, alleges that LCDJFS, Palmer, and Hayes have deprived plaintiffs of their rights to bilingual information and assistance guaranteed by § 2020(e)(1)(B) of the Food Stamp Act and its implementing regulations, 7 C.F.R. § § 272.4(b) and 272.5(b)(3).

Count two alleges that ODJFS and LCDJFS violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, by using criteria or methods of program administration that intentionally discriminate on the basis of national origin.

Count three alleges that LCDJFS and ODJFS violated § 2020(e)(1)(B) and 7 C.F.R. § § 272.4(b) and 272.5(b)(3) for failing to ensure the adequate provision of bilingual program information materials, notices, and bilingual staff or interpreters.

Count four alleges that LCDJFS, Hayes, and Palmer, in their official capacities, violated Title VI and 7 C.F.R. § § 15.3(a) and 15.3(b)(2) by failing to ensure the adequate provision of bilingual program information materials, notices and bilingual staff or interpreters.

Count five alleges that the Food Stamp Act provides an implied private right of action. Therefore, LCDJFS, Palmer, and Hayes violated § 2020(e)(1)(B) and its implementing regulations, 7 C.F.R. §§ 272.4(b) and 272.5(b), for failing to ensure the adequate provision of bilingual services.

Count six alleges that LCDJFS and Palmer violated Ohio law for failing to ensure the adequate provision of bilingual material and interpreters and that O.A.C. § 5101:4–1–05 provides a remedy for this violation.

## II. Procedural Background

This is the second Rule 12 motion filed by state defendants. State defendants' previous motion to dismiss was granted in part and denied in part.

In their previous motion, state defendants raised the defense of Eleventh Amendment immunity as to counts three and four. In response, plaintiffs voluntarily withdrew those claims. As to counts one and five, I granted state defendants' motion, finding that § 2020(e)(1)(B) of the Food Stamp Act and its implementing regulations did not create an enforceable right under § 1983 or an implied private right of action. As to count two, I denied state defendants' motion, finding that plaintiffs had alleged the essential elements of a Title VI claim based on national origin discrimination.

State defendants now move for judgment on the pleadings on count two—the only remaining claim against them. County defendants move for judgment on the pleadings on all counts.

## STANDARD OF REVIEW

Rule 12(c) provides, "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." FED.R.CIV.P.

---

1. The food stamp program is a federally funded government program administered by the states. The Food Stamp Act, 7 U.S.C. § 2011 *et seq.*, prescribes numerous requirements for a state agency's administration of the program. Specifically, under § 2020(d) a state agency desiring to participate in the federal food stamp program must create a state "plan of operation." 7 U.S.C. § 2020(d). The state plan of operation, among many other requirements, must "use appropriate bilingual personnel and printed material in the administration of the program in those portions of the political subdivisions in the State in which a substantial number of members of low-income households speak a language other than English." § 2020(e)(1)(B).

12(c). A motion for judgment on the pleadings is determined under the same standard of review as a motion to dismiss under Rule 12(b)(6). *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 11 (6th Cir. 1987). The only different between Rule 12(c) and Rule 12(b)(6) is the timing of the motion to dismiss. A motion to dismiss under Rule 12(b)(6) requires the moving party to request judgment in a pre-answer motion or in an answer. A motion for judgment on the pleadings under Rule 12(c) may be submitted after the defendants filed an answer.

Under Rule 12(b)(6), no complaint shall be dismissed unless the plaintiff has failed to allege facts in support of plaintiffs' claim that, construed in plaintiffs' favor, would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When deciding a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), the inquiry is essentially limited to the content of the complaint, although matters of public record, orders, items appearing in the record, and attached exhibits also may be taken into account. *See Yanacos v. Lake County,* 953 F.Supp. 187, 191 (N.D.Ohio 1996). The court must accept all the allegations stated in the complaint as true, *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), while viewing the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

## DISCUSSION

### I. State Defendants' Title VI Claim

#### A. Title VI

Title VI excludes from participation in federal assistance recipients of aid that discriminate against racial groups. The ODJFS and LCDJFS accept federal funding from the United States Department of Agriculture and are therefore subject to the restrictions of Title VI. Section 601 of that title provides that no person shall, "on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI, 42 U.S.C. § 2000d. Section 602 authorizes federal agencies to "effectuate the provisions of [§ 601] ... by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d–1.

In *Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that private individuals may sue to enforce Title VI. Congress has since ratified that holding: § 1003 of the Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7, expressly abrogates states' sovereign immunity against suits brought in federal court to enforce Title VI.

■ To state a claim under Title VI, the Supreme Court has made clear that a private individual must allege intentional discrimination, not disparate impact. *Alexander v. Sandoval,* 532 U.S. 275, 280–81, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("[Section] 601 prohibits only intentional discrimination.") (citing *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). Therefore, a private right of action to enforce Title VI does not include a private right to enforce disparate-impact regulations promulgated under § 602. *Id.* at 285–86, 121 S.Ct. 1511.[2]

### B. State Defendants' Previous Motion to Dismiss

In their previous motion, state defendants argued that plaintiffs failed to state

---

**2.** Before the decision in *Sandoval,* private individuals enforced federal regulations that prohibited policies that had racially disparate effects. The facts of *Sandoval* are illustrative of this.

a claim under Title VI because plaintiffs did not allege intentional discrimination, as required by *Sandoval.* To state a claim for intentional discrimination, state defendants argued that plaintiffs must allege that the defendants intended to treat similarly-situated persons differently on the basis of national origin. *See* Doc. 99 at 9 (citing *Hopwood v. Texas,* 78 F.3d 932, 957 (5th Cir.1996)).[3]

In my previous order, I responded to this argument, stating:

It is true that Title VI's coverage mirrors that of the Equal Protection Clause. *Alexander,* 532 U.S. at 282, 121 S.Ct. 1511; *Grutter v. Bollinger,* 288 F.3d 732, 742 (6th Cir.2002). Plaintiffs' complaint, however, alleges that they are being treated differently. Plaintiffs allege that they are being discriminated against on the basis of their Spanish language—thus, their ethnic origin—due to the failure to implement programs mandated by federal law. The existence of the mandate and the defendants' al-

leged knowing and long-term noncompliance shows, arguably, an intent to treat Spanish-speaking recipients of food stamps differently than English-speaking recipients. Basically, plaintiffs claim Spanish-speakers do not have the same access to food stamps as English speakers do.

Thus, plaintiffs have alleged the essential elements of a Title VI claim based on national origin discrimination. Defendants' motion is, therefore, denied.

Doc. 112 at 19–20 (12/03/02).

■ State defendants now move for judgment on the pleadings arguing that, in light of my previous order, plaintiffs' Title VI claim has "materially changed." Doc. 119 at 1. State defendants argue that my ruling "allows Plaintiffs to enforce the programmatic mandates of the Food Stamp Act through their Title VI claim." *Id.* In other words, plaintiffs' Title VI claim is now "nothing more than an attempt to privately enforce provisions that are not privately enforceable by calling them Title VI provisions instead of what they clearly

---

Plaintiffs in *Sandoval,* a class of non-English speakers, sued the Alabama Department of Public Safety because the state administered driver's license examinations only in English. The state department accepted grants of financial assistance from the United States Department of Justice ("DOJ") and Department of Transportation ("DOT") and so subjected itself to the restrictions of Title VI. The DOJ and DOT, under the authority of § 602, promulgated regulations forbidding funding recipients to "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin ...." 532 U.S. at 278, 121 S.Ct. 1511 (quoting 28 C.F.R. § 42.104(b)(2); 49 C.F.R. § 21.5(b)(2)).

The plaintiffs claimed that the state department's decision to administer driver's license examinations in English violated the DOJ and DOT regulations because it had the effect of subjecting non-English speakers to discrimination based on their national origin. The

lower courts agreed and ordered the state department to accommodate the non-English speakers. *Id.* at 279, 121 S.Ct. 1511. The Supreme Court reversed, concluding that there is no private right of action to enforce disparate-impact regulations under Title VI. *Id.* at 293, 121 S.Ct. 1511.

Therefore, after *Sandoval,* the only private right of action under Title VI is a claim of intentional discrimination. *Id.* at 281, 121 S.Ct. 1511 ("Title VI itself directly reaches only instances of intentional discrimination.").

3. State defendants argued that plaintiffs were being treated in the same manner as English-speaking recipients of food stamps. Accordingly, plaintiffs could not allege they were being treated differently or identify the persons to whom they were similarly-situated. Thus, according to state defendants, plaintiffs could not properly plead the elements of intentional discrimination.

are: Food Stamp provisions." Doc. 123 at 3. Because I allegedly "converted" count two into count three, state defendants argue that they are immune under the Eleventh Amendment.

State defendants misconstrue my prior order. I did not convert plaintiffs' Title VI claim into a claim to enforce the Food Stamp Act. My previous order denied state defendants' motion to dismiss plaintiffs' Title VI claim because plaintiffs alleged the essential elements of a Title VI claim. I wrote:

> Plaintiffs' complaint ... alleges that Title VI prohibits defendants from purposefully implementing criteria or methods that exclude limited English proficient persons from benefits or services on the basis of national origin. Plaintiffs further allege that state defendants have intentionally violated this prohibition with respect to plaintiffs, who are all Spanish-speaking recipients of food stamps.

> \*　　\*　　\*　　\*　　\*　　\*

> The existence of the mandate [Food Stamp Act and its regulations requiring bilingual services] and the defendants' alleged knowing and long-term noncompliance shows, arguably, an intent to treat Spanish-speaking recipients of food stamps differently than English-speaking recipients. Basically, plaintiffs claim Spanish-speakers do not have the same access to food stamps as English speakers do.

Doc. 112 16–17, 19–20 (12/03/02).

The fact that I mentioned the bilingual requirements of the Food Stamp Act was not an attempt to enforce those mandates. It was simply a reference to what plaintiffs use to prove the intent element of their claim. That is, plaintiffs allege that defendants' knowledge of and long-term noncompliance with the Food Stamp Act and its regulations is evidence of intentional discrimination.

Nonetheless, the confusion resulting from my last order demonstrates that this is a complex case and one that is not subject to easy categorization. Moreover, since *Sandoval*, there is no clear precedent as to what a plaintiff must allege to present a claim for intentional discrimination under Title VI. Because of this confusion, I will further clarify my reasoning why state defendants' motion for failure to state a claim was denied.

## C. Proving Intentional Discrimination and Facially Neutral Policies

Because of *Sandoval*, many cases finding a violation of Title VI—or the regulations promulgated under it—are not good law.[4]

4. *See e.g., Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). In this case, non-English speaking Chinese students sued the San Francisco Unified School District alleging that they were denied equal educational opportunities because they did not receive English language instruction pursuant to Department of Health, Education, and Welfare regulations and guidelines instructing school districts to rectify language deficiencies. *Id.* at 565–68, 94 S.Ct. 786.

The lower courts denied plaintiffs relief under Title VI, but the Supreme Court reversed, stating:

> [T]here is no equality of treatment merely by providing students with the same facilities, textbooks, teachers, and curriculum; for students who do not understand English are effectively foreclosed from any meaningful education.

*Id.* at 566, 94 S.Ct. 786.

The Court interpreted § 601 to proscribe disparate impact discrimination, concluding:

> [T]he Chinese-speaking minority receive fewer benefits than the English-speaking majority from respondents' school system which denies them a meaningful opportunity to participate in the educational program—all earmarks of the discrimination banned by the regulations.

*Id.* at 568, 94 S.Ct. 786.

However, even if there is little case law after *Sandoval*, state defendants' theory that plaintiffs can only allege a claim of intentional discrimination by demonstrating they were "treated differently than similarly-situated individuals" is not an accurate statement of the law. Claims of intentional discrimination can be based on facially neutral laws or practices. *See Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("As we made clear in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.")

To prove intentional discrimination by a facially neutral policy, a "plaintiff must show that the rule was promulgated or reaffirmed *because of,* not merely in spite of, its adverse impact on persons in the plaintiff's class." *Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir.1994) (quoting *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282).

An "important starting point," however, for assessing discriminatory purpose is the "*impact* of the official action." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555 (emphasis added). In *Arlington Heights,* the Supreme Court specifically stated:

Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another,"—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race,

emerges from the effect of the state action even when the governing legislation appears neutral on its face.

*Id.; see also Reno v. Bossier Parish School Bd.* 520 U.S. 471, 487, ·117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) ("[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions.").

The reasoning of a recent, post-*Sandoval* case demonstrates this precedent that the impact of a neutral policy or practice can be used as evidence of intentional discrimination.

In *Pryor v. NCAA,* 288 F.3d 548 (3d Cir.2002), a class of African–American student athletes alleged that the NCAA adopted scholarship and athletic eligibility criteria—Proposition 16—because of its adverse impact on black student athletes seeking college scholarships. *Id.* at 552. As a result of Proposition 16, plaintiffs alleged that an increased number of African–American student athletes lost eligibility for receiving athletic scholarships and for participating in intercollegiate athletics. *Id.* at 552.

The district court dismissed the Title VI claim finding that Proposition 16 was a facially neutral policy that incidentally created a disparate impact. *Id.* at 557. Further, the lower court reasoned that Proposition 16 was motivated by the desire to improve graduation rates for all student athletes. *Id.*

The appellate court reversed, finding that plaintiffs' complaint stated a claim for intentional discrimination because it alleged that the NCAA "considered race as one of its reasons for adopting Proposition 16." *Id.* at 564. Furthermore, the court found that the complaint alleged

that the NCAA purposefully discriminated against black student athletes (like Plaintiffs) when it adopted Proposition 16 because the NCAA knew—via

various studies and reports—that the heightened academic requirements of Proposition 16 would effectively 'screen out' or reduce the percentage of black athletes who could qualify for athletic scholarship. In short, the complaint alleges that the NCAA adopted Proposition 16 because it knew that policy would prevent more black athletes from ever receiving scholarship aid in the first place.

*Id.* at 564.

Similarly, in *South Camden Citizens in Action v. New Jersey Dep't of Env't Prot.,* 254 F.Supp.2d 486 (D.N.J.2003), plaintiffs stated a claim for intentional discrimination based—at least partially—on the knowledge of the impact of a facially neutral policy. In this case, the residents of a mostly minority community sued the New Jersey State Department of Environmental Protection to enjoin construction of a cement grinding facility, which, plaintiffs claimed, would have a disparate impact on the residents of their community. *Id.* at 489.

The court denied the defendants' motion to dismiss, finding that plaintiffs alleged facts that "not only show that the opera-

tion of the cement grinding facility would have a disparate impact upon the predominantly minority community ... but also that the [defendant] was well-aware of the potential disproportionate and discriminatory burden placed upon that community and failed to take measures to assuage that burden." *Id.* at 497.

On the issue of the necessary intent, the court stated:

The controlling decisions of the Supreme Court and the Third Circuit make it clear that a case of intentional discrimination is often based upon the type of circumstantial evidence which the [ ] Plaintiffs allege in the Second Amended Complaint, namely, disparate impact, history of the state action, and foreseeability and knowledge of the discriminatory onus placed upon the complainants.

*Id.* (citing *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555; *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 465, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Pryor,* 288 F.3d at 563).

The Sixth Circuit has not spoken on what a plaintiff must allege to state a claim of intentional discrimination under Title VI since the decision in *Sandoval.*[5] Nonethe-

---

5. In a pre-*Sandoval* case, the Sixth Circuit noted that two standards have been used to determine intent when a facially neutral policy is challenged: the "discriminatory animus" test and the "deliberate indifference" test. *Horner v. Kentucky High School Athletic Ass'n,* 206 F.3d 685, 692–93 (6th Cir.2000).

The deliberate indifference test arose from cases involving deliberate indifference to sexual harassment under Title IX of the Education Amendments of 1972, as amended by the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1681, ("Title IX"). *See e.g., Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). Under this test, "intent" means "actual notice" of the abuse by a third party and a failure to stop it. *Horner,* 206 F.3d at 693.

In *Horner,* the Sixth Circuit noted that it could imagine a scenario where a "deliberate

indifference test might be appropriate," as "when Plaintiffs claim that defendant school officials had actual knowledge of disparate impact of their policies, either at the time of enactment or when subsequently brought to their attention post-enactment, and turn a blind eye." *Id.* at 693 n. 4. The court did not, however, specifically adopt the test as a way to prove intentional discrimination.

The Tenth Circuit recently used the deliberate indifference test to prove intentional discrimination in a Title VI case. In *Bryant v. Indep. Sch. Dist. No. I–38,* 334 F.3d 928, 930–31 (10th Cir.2003), plaintiffs alleged that the defendant school district created and contributed to a racially hostile education environment. *Id.* at 930–31. The trial court found that Title VI did not provide a private right of action for this kind of claim. *Id.* at 930–31. The Tenth Circuit reversed, stating:

less, the decisions from the Third Circuit are instructive.

### D. Plaintiffs' Allegations

■ Like the plaintiffs in *Pryor* and *South Camden Citizens*, plaintiffs in this case have stated a claim for intentional discrimination based on a facially neutral policy.

Plaintiffs allege that defendants' have a policy, practice, or custom of failing to provide bilingual services—that is, sending out materials in English only. Fourth Amended Complt. at ¶ 198. Plaintiffs allege that defendants purposefully implemented this policy or practice, knowing of its impact on Spanish-speaking food stamp recipients.

To prove defendants' intent, plaintiffs allege that defendants have agreed to administer the state food stamp program in accordance with the Food Stamp Act, its implementing regulations, and Title VI. *Id.* at ¶¶ 66–69. Plaintiffs allege that in a previous action, *Juvier v. Steger*, No. 3:96CV7564 (N.D.Ohio Sept. 11, 1996), similar plaintiffs sued under a similar claim. *Id.* at ¶¶ 70–73. Plaintiffs allege that in *Juvier*, the director of the Lucas County Department of Human Resources testified that the department had a legal obligation to provide translation assistance. *Id.* at ¶ 77. Plaintiffs allege that in *Juvier*'s 1997 partial consent decree, county defendants agreed to plan to identify LEP food stamp applicants and recipients and send Spanish notices to LEP persons so identified. *Id.* at ¶¶ 94–95. Plaintiffs allege that in 1999, county defendants entered into an agreement with state defendants to provide the latter with Spanish language CRIS-E notices. *Id.* at ¶¶ 97–98. Plaintiffs allege that state defendants have not complied with the terms of that agreement. *Id.* at ¶¶ 99–100.[6]

Because of these prior instances, plaintiffs allege that state and county defendants knew of their obligations to provide bilingual services to plaintiffs but continued failing to do so. *See e.g., id.* at ¶¶ 85, 128, 130, 147–150, 155, 180, 188. As a result of defendants' decisions, plaintiffs allege that they have been harmed—either by benefits being delayed or changed—because they could not understand the English-language materials.

---

this is a case where students and parents complained to the principal about the racist environment and the principal did not attempt to remedy the situation. The principal affirmatively chose to take no action. Choice implicates intent..... [W]e are holding that when administrators who have a duty to provide a nondiscriminatory educational environment for their charges are made aware of egregious forms of intentional discrimination and make the intentional choice to sit by and do nothing, they can be held liable under § 601.

*Id.* at 932–33.

If "deliberate indifference" were the standard to determine intent in this case, there would be no question that plaintiffs have stated a claim. If plaintiffs' allegations are true, defendants' conscious choice to ignore or refuse to remedy the effect of their English-only policy or practice causes the disparate effect to continue.

As noted, however, the Sixth Circuit has not adopted the deliberate indifference test for Title VI cases. Moreover, the test has only been used in either racial or sexual harassment or hostile environment claims, and it does not seem directly transferable to other contexts. *See e.g., Pryor*, 288 F.3d at 569 ("We have found no authority in Supreme Court precedent to now conflate the tests or to otherwise dilute the purposeful discrimination standard of *Alexander v. Sandoval* and allow a Title VI claim to stand on the basis ... [of the] 'deliberate indifference' standard.").

6. Alternatively, plaintiffs allege that if state defendants have complied with the terms of that agreement, they have not adequately identified LEP clients because plaintiffs have not received the notices in Spanish. Fourth Amended Complt. at ¶ 101.

Liberally construing the complaint, plaintiffs allege that defendants purposefully discriminated against them when defendants chose to continue a policy of failing to ensure bilingual services and knowing that Spanish-speaking applicants and recipients of food stamps were being harmed as the consequence. If these allegations are true, one could logically infer that the policy was implemented and is being continued "because of" its impact on national origin.

Accordingly, I cannot conclude, that beyond a doubt, no set of facts alleged in plaintiffs' thirty-five page Fourth Amended Complaint would entitle plaintiffs to relief. *See e.g., Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (stating that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

State defendants' motion for judgment on the pleadings is therefore denied.

## II. County Defendants

County defendants move for judgment on the pleadings on all of plaintiffs' six counts. Because my previous order found that the Food Stamp Act and its implementing regulations do not create a private enforceable right under § 1983 or an implied private right of action, county defendants motion as to counts one and five is granted. Also, because plaintiffs' withdrew counts three and four, county defendants' motion as to these claims is granted. Therefore, the only remaining claims are plaintiffs' Title VI claim and their attempt to enforce O.A.C. § 5101:4–1–05(B).

### A. Title VI

County defendants "incorporate" state defendants' argument regarding Title VI. Doc. 121 at 5. Therefore, they argue they are immune under the Eleventh Amendment because plaintiffs are actually attempting to enforce the mandates of the Food Stamp Act.[7] As explained above, my previous order did not convert plaintiffs' Title VI claim into one to enforce the Food Stamp Act, and plaintiffs have alleged the essential elements of a claim for intentional discrimination. County defendants' motion for judgment on the pleadings as to count two is therefore denied.

### B. Private Enforcement of O.A.C. § 5101:4–1–05(B)

■ Plaintiffs sue to enforce O.A.C. § 5101:4–1–05(B), a provision similar to the Department of Agriculture's regulation, that requires county agencies to provide bilingual services based on the number of low-income LEP households in the county. § 5101:4–1–05(B)(1).

County defendants argue that § 5101:4–1–05(B) does not provide for a private cause of action. According to county defendants, the test under Ohio law to determine if a state statute or regulation creates a private civil cause of action is the same test used by federal courts. Therefore, because the Food Stamp Act and its regulations do not create a private cause of action, the Ohio regulations do not either.

In response, plaintiffs argue that they have a right to enforce § 5101:4–1–05(B) because the test for determining the availability of an implied private right of action in Ohio is different from the federal standard. According to plaintiffs, the Supreme Court of Ohio adopted the three-prong *Cort v. Ash*, 422 U.S. 66, 95 S.Ct.

---

7. County defendants argue they are immune under the Eleventh Amendment because they are an "arm of the state." Doc. 121 at 5–6.

2080, 45 L.Ed.2d 26 (1975), test. *See e.g., Fawcett v. G.C. Murphy & Co.,* 46 Ohio St.2d 245, 348 N.E.2d 144 (1976). Under this test, the court must ask:

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of legislative scheme to imply such a remedy for the plaintiff?

*Strack v. Westfield Cos.,* 33 Ohio App.3d 336, 337, 515 N.E.2d 1005 (1986) (quoting *Cort,* 422 U.S. at 78, 95 S.Ct. 2080).

The issue whether Ohio courts would adopt the federal standard (or whether the federal standard is even different from the Ohio standard) is, however, irrelevant for the purposes of interpreting this regulation. Because it cannot be concluded that the Ohio Legislature, by "clear implication," intended to create a civil action for breach of § 5101:4–1–05(B), plaintiffs' claim fails under any standard. *See Fawcett,* 46 Ohio St.2d at 249, 348 N.E.2d 144 (superceded by statute); *see also Nielsen v. Ford Motor Co.,* 113 Ohio App.3d 495, 681 N.E.2d 470, (1996)("[T]he Ohio Supreme Court has held that a 'statutory policy' may not be implemented by the Ohio courts in a private civil action absent a clear implication that such a remedy was intended by the Ohio Legislature.").

O.A.C. § 5101:4–1–05(B) was adopted pursuant to O.R.C. § 5101.54. This statute requires the director of the ODJFS to administer the state's food stamp program in accordance with the federal Food Stamp Act, and it authorizes the department to adopt rules that are consistent with the Food Stamp Act—like § 5101:4–1–05(B).

No where in the Ohio statutory or regulatory framework does it provide for a civil remedy to a private party aggrieved by a county agency for not complying with the state. In fact, the regulation itself reveals an intent to restrict any enforcement to the county agency. Section (B)(5) of the regulation provides:

> The county agency shall ensure that certification offices subject to the requirements of paragraph (B)(2) and (B)(3) of this rule provide sufficient bilingual staff or interpreters for the timely processing of non-English speaking applicants.

O.A.C. § 5101:4–1–05(B)(5).

Therefore, there is no indication of any legislative intent to create a private remedy under § 5101:4–1–05(B), and there is some evidence that the legislature intended to deny one.

Additionally, as I explained in my previous order, regulations cannot be used as a basis for creating a private cause of action unless there is a statute that establishes such a right. As the Supreme Court stated in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001),

> Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may plead the sorcerer's apprentice but not the sorcerer himself.

*Id.* at 291, 121 S.Ct. 1511 (citations omitted).

Even though Ohio courts have not specifically adopted this holding in *Sandoval,*

they have followed federal law when determining whether to imply a private cause of action. Thus, even though the Supreme Court of Ohio has not caught up with the latest permutations of the federal doctrine set out in *Sandoval* or *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), I have no doubt that, when called on to do so, Ohio will continue to align itself with the federal standard. Therefore, because O.R.C. § 5101.54 does not create a private right, regulations authorized pursuant to it may not either.

County defendants' motion for judgment on the pleadings as to count six is therefore granted.

### C. Declaratory Judgment

In their brief in opposition, plaintiffs argue that their claims should not be dismissed because they seek, among other remedies, declaratory relief. Specifically, in their complaint, plaintiffs request this court to:

> Declare that Defendants' failure to provide Plaintiffs and the class they seek to represent with adequate bilingual notices, program informational materials, certification materials and interpreters or bilingual staff has restricted their participation in and enjoyment of the Food Stamp program on account of their national origin and Limited English Proficiency in violation of 7 U.S.C. § 2020(e), 42 U.S.C. § 2000d and federal regulations.

Fourth Amended Complt. at 34.

According to plaintiffs, the only reason that might support dismissal of their declaratory judgment action without considering the merits is if no justiciable issue or actual controversy exists between the par-

ties or if a declaratory judgment will not terminate the controversy. Doc. 125 at 12.

The Declaratory Judgment Act states that "in a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. The Supreme Court has repeatedly emphasized the discretionary nature of the Act. *See e.g., Green v. Mansour*, 474 U.S. 64, 72, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (The statute "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.") (quoting *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952)).

The Declaratory Judgment Act, however, does not create substantive rights. It merely creates a procedure for adjudicating existing rights. Therefore, plaintiffs do not have a declaratory judgment cause of action under the Food Stamp Act or its regulations. As I explained in my previous order, neither the Food Stamp Act nor its regulations create a federal right. Therefore, plaintiffs' declaratory judgment cause of action as to § 2020(e) and its implementing federal regulations is dismissed.[8]

### CONCLUSION

It is, therefore,

**Ordered that**

1. State defendants' motion for judgment on the pleadings as to plaintiffs' Title VI claim be, and hereby is, denied.

---

**8.** In their briefs, parties argue whether the state or federal declaratory judgment statute should apply. I assume this is because plaintiffs believe they are also seeking declaratory judgment as to county defendants' alleged violation of O.A.C. § 5101:4–1–05(B). This claim, however, was not mentioned in their complaint. Nonetheless, because § 5101:4–1–05(B) does not create enforceable rights, a declaratory judgment cause of action for violation of the regulation would similarly fail.

2.   County defendants' motion for judgment on the pleadings as to counts one, five, and six of plaintiffs' complaint, be and hereby is, granted.

3.   County defendants' motion for judgment on the pleadings as to plaintiffs' Title VI claim be, and hereby is, denied.

**So ordered.**