# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-1259

LONNELL BREWER,

*Plaintiff-Appellant,*

*v.*

BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 02-CV-2204—**David G. Bernthal**, *Magistrate Judge.*

ARGUED SEPTEMBER 21, 2006—DECIDED MARCH 21, 2007

Before BAUER, CUDAHY, and WOOD, *Circuit Judges.*

CUDAHY, *Circuit Judge.* This case concerns the corrupt, Machiavellian world of permit parking at the University of Illinois's Urbana-Champaign campus, and the ill fortune of a student who became involved in it. Lonnell Brewer claims that he was fired from his student job at a University personnel office and subsequently booted from a master's degree program because one of his supervisors at the personnel office, Kerrin Thompson, failed to tell *her* supervisor that she had given Brewer permission to park his car in a certain University parking lot. Thompson kept silent about this, says Brewer, because Brewer is black and she wanted him fired, putting the University in violation of Titles VI and VII of the Civil

Rights Act of 1964. The University admits that Brewer was fired for modifying a University parking tag, but claims that his termination from the master's program was only for his poor academic performance and denies that any decision attributable to it was motivated by race. The district court granted the University summary judgment on Brewer's claims. Brewer appeals. We affirm.

## I. Background

We begin by recounting Lonnell Brewer's strange tale of intrigue; because he appeals from a grant of summary judgment we resolve all conflicts in the evidence and draw all permissible inferences in his favor. *Berger v. AXA Network LLC*, 459 F.3d 804, 806 (7th Cir. 2006). Brewer's career at the University of Illinois at Urbana-Champaign started well enough. Already armed with a bachelor's degree in psychology, he enrolled in the University's psychology Ph. D. program in the fall of 1995. After completing two years of study he decided not to pursue the Ph. D. and instead to transfer to the master's degree program at the University's Institute of Labor and Industrial Relations (ILIR). Upon transferring he received merit-based financial aid and also an ILIR research assistantship under which he would receive a stipend for working ten hours each week at the University Personnel Services Office (PSO).

Brewer alleges a complicated trail of causation that leads back and forth between actors and events at these two institutions. Consequently, our tale must jump back and forth between the PSO and the ILIR to follow his story.

### A. Brewer's Work at the PSO in Early Fall 1997

Brewer claims that his troubles began at the PSO with one of his supervisors, Kerrin Thompson, assistant to PSO

Director Denise Hendricks (both of whom are white). In early September, on the first day of his research assistantship, Brewer met with Thompson and learned that he would be working on part of a large survey. They discussed the requirements of the assistantship, among them the time and dress expected (flexible hours to allow Brewer to schedule interviews with prospective employers; casual dress, with jeans specifically acceptable). Thompson also explained where Brewer could park when working at the PSO, a topic of eventual great importance. Brewer says that Thompson gave him a temporary University parking tag and

> kind of gestured you can park here (indicating), park there (indicating), and, you know, I was in her office so I wasn't really oriented as to where that meant, but basically she pointed to all the different spots in the building, so it was almost a 360 degree kind of gesture, indicating to me that I could pretty much park anywhere at the PSO as long as I had my tag on my mirror. (Brewer Dep. at 66.)

Trouble began to develop between Thompson and Brewer on October 8 or 9, 1997, ostensibly when Thompson learned that Brewer's fiancee was white. From that point on, Thompson's "posture became noticeably and increasingly hostile" (Brewer Dep. Ex. 14 at 5), and she did things to embarrass Brewer and make working at the PSO difficult for him. For instance, she would sometimes go around the office asking if anyone knew where Brewer was, even on days when he was not supposed to be in the office, and she refused to let Brewer work off-site to take advantage of software for the blind and dyslexic that reads words aloud.[1]

---

[1] Brewer suffers from a learning disability, but the record does not contain evidence of its nature. The complaint states that

(continued...)

On October 13 or 14, Brewer received a warning from Elyne Cole, the PSO's Director of Employment Services (who is black),[2] about a "person who you think is your friend" who was in fact an enemy. (Brewer Dep. Ex. 14 at 5.) Brewer pressed for more information. While she was reluctant to talk at first, Cole eventually revealed that Thompson was a racist and that Cole had overheard Thompson saying disparaging things about Brewer, such as that he lacked urgency about his work. Cole warned Brewer that Thompson had a lot of influence with Hendricks and urged Brewer to start recording the times he was present and working at the PSO, even though there was no formal requirement that he do so. Brewer followed her advice, having a secretary verify and sign his record.[3]

---

[1] (...continued)
"[p]sychologists have concluded that Plaintiff's symptoms are consistent with DSMIII-R diagnosis of Specific Developmental Disorder—Not Otherwise Specified." (Compl. ¶ 36.) Given the nature of the accommodations Brewer sometimes sought, we suspect that it may be similar to dyslexia, but we are not sure.

[2] While Brewer was the only black student to ever hold the ILIR research assistantship at the PSO, the PSO did, at the time, have numerous other black employees.

[3] In fact, Brewer did far more: he began to compose a lengthy journal detailing events at the PSO and ILIR that he thought indicative of racial animus against him. (Brewer Dep. at 91.) The narrative was reconstructed after the fact using notes and emails, and entries were not necessarily written contemporaneously with the events they reported. (Brewer Dep. at 93-94.) Brewer offered this journal into the record and frequently cites to it. (*See* Brewer Dep. Ex. 14.) Brewer affirmed that the journal is a "true and accurate account of the events that occurred at or near the times referenced therein," but given the irregular mode of its composition there might be an embedded
(continued...)

B.  Brewer's Studies at the ILIR in Early Fall 1999

Meanwhile, Brewer was beginning a very ambitious program of study at the ILIR. Normally, students would complete the ILIR program in three semesters; Brewer hoped to complete the program more quickly through a combination of an unusually demanding schedule, a waiver of one requirement and summer courses. A student could not enroll in more than four courses per semester without an advisor's permission, but Brewer persuaded his advisor, Prof. Michael LeRoy, to permit him to enroll in five courses for the Fall 1997 semester. Another one of Brewer's professors, Wallace Hendricks (husband to PSO Director Denise Hendricks), urged Brewer not to do this, saying that such a hectic schedule would not allow Brewer to take full advantage of the program, especially in light of the time he was scheduled to work at the PSO.

Brewer's research assistantship at the PSO was awarded and sponsored by the ILIR, and throughout the fall semester there were signs that the ILIR faculty was aware of Brewer's performance in the assistantship, and more specifically Thompson's opinion of it. For instance, Professor Wallace Hendricks once told Brewer that Thompson thought Brewer had missed a day of work and that he should stop wearing jeans at work.

---

[3] (...continued)
hearsay problem. *See* Fed. R. Evid. 803(5) (permitting into evidence a written record "made or adopted by the witness when the matter was fresh in the witness's memory"). At any rate, the University does not object to Brewer's use of the document and we therefore consider it as though it were testimony.

C.  Blown PSO Deadline in Late Fall 1997

Prof. Wallace Hendricks's warning against the five-course schedule turned out to be well-grounded. When the Fall 1997 semester neared its end, the combination of five classes, the PSO assistantship and additional extracurricular activity worked Brewer to the bone, and the time constraints he faced proved too demanding. When asked early in the semester to pick a deadline for his portion of the survey at the PSO, Brewer had chosen the final Friday before finals week. He had thought that by completing the project on that day he would be free to devote himself to studying before and during his finals. But the deadline came and his project was not quite ready. After speaking with his project supervisor, Judy Baker, he agreed to complete the project over the weekend and submit it on Monday.

That same Friday, Thompson and Hendricks separately spoke to Brewer about the missed deadline and what they believed were other performance problems. Thompson told Brewer that he lacked "initiative and motivation" and had not been working enough; Brewer argued with her, showing her his unofficial timesheet and saying he missed the deadline because she did not let him use the off-site dyslexia software. (Brewer Dep. Ex 14 at 6-7.) Later, Brewer met with Hendricks, who said that she had talked with ILIR Director Peter Feuille and was considering terminating Brewer's assistantship with Feuille's support. She considered the blown deadline serious and further reported that Thompson thought Brewer wasn't working his ten hours a week. Brewer offered to show Hendricks his unofficial timesheet but she declined to view it. She stated that she had been excited to have a minority working at the PSO, but was "disappointed [by the blown deadline] because the first thing I thought when Kerrin [Thompson] told me was what a waste." (Brewer Dep. Ex. 14 at 7.)

On Monday, Brewer submitted his portion of the survey to Baker as arranged. When Hendricks saw the project she was pleased with it and decided to keep Brewer on, saying that she had suspected the project was in worse shape than it was and acted hastily.

D.  ILIR Finals in Late Fall 1997

Brewer's end-of-semester time crunch was not yet over; indeed, Brewer had been forced to split his focus between studying and the PSO situation in the days before finals. He had to ask Prof. LeRoy for extensions on take-home papers in two different classes; LeRoy assigned penalties on each paper. Brewer also received an extension without penalty in a class under Professor Joseph Martoccio. All of Brewer's final exam grades were quite poor (for instance, he wrote the lowest-graded exam in Prof. Wallace Hendricks's Quantitative Methods course). His overall semester grades took a nosedive.

But inadequate preparation time wasn't Brewer's only problem; he received word that his professors graded him down because of his troubles at the PSO. One of Prof. Wallace Hendricks's TA's informed Brewer that Hendricks had "insisted on giving [Brewer] a C+ because of what happened" there (Brewer Dep. Ex. 14 at 11), and Prof. LeRoy told Brewer that his late-penalty was more severe than normal in part because "your performance at the PSO has somewhat called into question your credibility" (Brewer Dep. Ex. 14 at 9).

Brewer finished the Fall 1997 semester with a GPA of 2.866. The minimum cumulative GPA expected of ILIR students is 3.0. If a person goes two semesters with a cumulative GPA of less than 3.0, they are generally dropped from the master's program. In January, Prof. LeRoy, acting in his capacity as head of the On-Campus

Committee, wrote to inform Brewer of this danger and recommend that he take a light, three-course schedule next semester to improve his GPA. On January 23, 1998, Feuille wrote Brewer to express his disappointment at Brewer's failure to complete the PSO project on time and warn him that his work and academic trouble were both caused by his excessive class load.

### D.  Parking Scandal and Firing from the PSO in Spring 1998

Brewer took only three classes in Spring 1998. He still suffered at the PSO under Thompson, but he experienced no major work-quality crises like the blown deadline at the end of the Fall 1997 semester.

Nonetheless, Brewer's job was jeopardized by a strange parking scandal. One day in early April, possibly April 13, Brewer's car was ticketed because the temporary parking tag Thompson had given him at the start of the Fall semester broke and fell off his rearview mirror. The tag was hand-written and purported to grant permission to park in either the E7 (PSO) or the C8 (ILIR) lots. Brewer basically admits that he wrote the C8 lot permission on the tag himself, without anyone's explicit permission to do so.[4] Brewer took the tag to University parking services to have it replaced, but a clerk looked up the PSO's application for the tag and discovered that it contained inaccurate information. Parking services suspected that Brewer was not entitled to park anywhere at all, and

---

[4]  To be more hair-splitting, Brewer admits that he "may" have written "C8" on the tag and that the tag did not say "C8" when Thompson gave it to him. (Brewer Dep. at 66-67.) In his journal, Brewer stated that he wrote "C8"on the tag because Thompson "neglected" to do so. (Brewer Dep. Ex. 14 at 15.)

issued him another temporary parking tag pending further investigation.

When Brewer arrived at work the next day, he went to speak with Thompson about the parking tag. As soon as he entered her office she announced: "I know what you did." (Brewer Dep. Ex. 14 at 15.) Irate, Thompson explained that Brewer was indeed not supposed to have a parking tag and that he should not have gone to parking services. She said that the PSO "trust[s] me to give parking tags to the type of people that can be trusted" (Brewer Dep. Ex. 14 at 16), and that she had lied on the application to get Brewer a tag. Brewer's indiscretion could cost him his job, as Hendricks had already talked to the ILIR about the incident.

Brewer reminded Thompson that she had told him to park anywhere and a heated argument erupted, during which Thompson became quite upset. She stated that she was "through with you people" and that Brewer was "a smart one." (Brewer Dep. Ex. 14 at 16.) She ordered Brewer to retrieve the troublesome parking tag; when he turned to leave her office she yelled, "I have had it with you nigger, get my tag!" (Brewer Dep. Ex. 14 at 17.)

Some time later, Brewer went to speak with Hendricks. She told him that "I and I alone have decided to terminate your assistantship." (Brewer Dep. Ex. 14 at 18.) Although the parking tag issue did not merit termination in the abstract, Hendricks said the PSO had a "special relationship" with parking services and feared that she would lose "parking flexibility" unless she fired someone. If the "special relationship" fell apart, the PSO would have to pay an additional one thousand dollars a year for the parking it was currently using. (Brewer Dep. at 77; *id.* Ex. 14 at 18.)

Brewer told Hendricks that Thompson gave him permission to park in the C8 lot. He also said that Thompson

could not be trusted to confirm this because she was a racist and wanted him fired, relating the things Thompson had said in their meeting. Hendricks replied that she didn't know whether Thompson had said such things to Brewer, but that at any rate it was an issue solely between Thompson and Brewer. Because Brewer admitted to taking the altered tag to parking services, he should be fired.

Because it will prove important, we also set out Hendricks's testimony concerning the parking scandal. Hendricks claimed she fired Brewer for "adulterating" the parking tag. (Hendricks Dep. at 35.) Thompson told her parking services was upset because Brewer wrote "C8" on the tag, and she decided to fire Brewer after inspecting the tag and verifying the addition for herself. She did not talk to Brewer before reaching her decision and in fact never talked to him about the parking fiasco at all. She testified that if Brewer had told her that Thompson told him to add "C8" to the tag, that "would have led to further conversation." (*Id.* at 49.) If Brewer had told her about Thompson's racist language, she would have taken that very seriously. When asked whether such language would give her reason to distrust Thompson with regard to Brewer, she replied, "I think I would have very great difficulty in answering that question. It has too many components to it, and that would be one that I would have to deal with the facts of the situation." (*Id.* at 66.)

Brewer was fired from the PSO effective April 21, 1998. The ILIR terminated his research assistantship and the financial aid that went with it that same day.

E.  Termination from the ILIR Program in Spring 1998

Although Brewer limited himself to three classes in the Spring semester, his cumulative GPA at the end of the semester was 2.959, still short of the required 3.0. ILIR

policy dictates that students with a cumulative GPA of less than 3.0 after two semesters should be dropped from the program absent "extraordinarily compelling circumstances." (Brewer Dep. Ex. 13 at 1.) ILIR Director Feuille applied the rule and gave Brewer the boot. Prof. LeRoy later told Brewer that the On-Campus committee recommended to Feuille that Brewer be retained because his poor grades were the result of his heavy workload rather than a reflection of poor ability; however, Director Feuille rejected its recommendation "based on the incident at the PSO." (Brewer Dep. Ex. 14 at 23.)

### F.  Legal Action

Brewer then brought the present action against the University, arguing, among other things, that he was fired from the PSO because of his race, in violation of Title VII of the Civil Rights Act of 1964, that he was dropped from the ILIR program because of his race, in violation of Title VI, and that PSO employees said unfavorable things about him to ILIR faculty in retaliation for his complaints about Thompson's racism, in violation of Title VII. The University moved for summary judgment. In response, Brewer argued both that the evidence established a prima facie case for all three of his claims under the burden-shifting *McDonnell-Douglas* framework, and that even without the benefit of *McDonnell-Douglas* a jury could still reasonably believe that his firing and termination from the master's program had been racially motivated. He noted that Hendricks, Fueille and others frequently made reference to his race, which he claimed showed that the University held black students and employees to higher standards than others. Alternately, he argued, a jury could conclude that Thompson's failure to reveal that she told Brewer to park anywhere was responsible for everything; her silence got Brewer fired and the firing got

Brewer dropped from the master's program. The district court granted summary judgment to the University. Brewer now appeals.

## II.  Discussion

We review the district court's grant of summary judgment *de novo. Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007). Summary judgment is appropriate where the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Kampmier*, 472 F.3d at 936. There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party. *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Yindee v. CCH Inc.*, 458 F.3d 599, 601 (7th Cir. 2006).

### A.  Title VII: Firing from the Personnel Services Office

First, Brewer claims that his firing from the PSO violated Title VII of the Civil Rights Act of 1964. Among other things, Title VII makes it unlawful for "an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Acting "because of race" means acting with a racially discriminatory reason in mind. *Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005); *Hildebrandt v. Ill. Dept. of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003).

A plaintiff can avoid summary judgment in two ways: the burden-shifting method first established in *McDonnell-*

*Douglas Corp. v. Green*, 441 U.S. 792, 802 (1973), often called the "indirect" method of proof, or the conventional method of presenting a "convincing mosaic" of direct or circumstantial evidence that could permit a reasonable jury to conclude that the employer acted with discriminatory intent, often called the "direct" method of proof.[5] *Jordan*, 396 F.3d at 831-33. Brewer seeks to proceed using both methods of proof.

### 1. Indirect Method of Proof

Under the indirect method of proof, the defendant seeking summary judgment must offer a legitimate, nondiscriminatory reason for its actions once the plaintiff makes out a prima facie case of discrimination. *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006). To make out a prima facie case, Brewer must show that (1) he was a member of a protected class, (2) he was qualified for his position at the PSO and met the PSO's legitimate expectations, (3) he suffered an adverse employment action (that is, an unfavorable material change in the terms, conditions, or privileges of his employment), and (4) similarly-situated non-class members were treated more favorably than he. *Id.* If a prima facie case has been shown and the defendant offers a nondiscriminatory reason for its actions, the burden shifts back to the plaintiff to demonstrate that the suggested reason is mere pretext for discrimination. *Id.*

---

[5] While the terms "direct" and "indirect" are often used without trouble, they sometimes cause confusion when litigants believe that the "direct" method of proof permits consideration only of direct evidence—that is, testimony concerning an employer's open admission of discriminatory intent—and not circumstantial evidence. *See, e.g.*, *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003).

In the present case, it doesn't matter whether Brewer has presented a prima facie case; the University has offered a legitimate, nondiscriminatory reason for his firing (the parking scandal), and Brewer's argument that this reason was not in fact nondiscriminatory will be addressed below in connection with the direct method of proof. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11 (1993) (holding that once a defendant comes forward with a nondiscriminatory reason for its actions, the *McDonnell-Douglas* framework "simply drops out of the picture"); *Nawrot v. CPC Intern.*, 277 F.3d 896, 906 (7th Cir. 2002); *King v. Preferred Technical Group*, 166 F.3d 887, 893 (7th Cir. 1999). Even if the prima facie case were important, Brewer makes no effort to show that any other employee stood accused of anything similar to missing an important deadline or committing a parking indiscretion, and consequently has failed to show that he was treated worse than a similarly situated employee who was not black. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-07 (7th Cir. 2007); *Hull v. Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006).[6]

---

[6] Brewer also argues for the first time on appeal that he was treated worse than a similarly situated non-black person because he was "replaced" by a non-black person. *See Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004), *citing Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999); *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir. 1997). The argument is forfeited. *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 916 (7th Cir. 2005). Even if it were not, it is doubtful that Brewer was "replaced" for purposes of a prima facie case, since no one took over Brewer's job before his assistantship would have expired anyway in the normal course of events.

2.  Direct Method of Proof

Because Brewer does not succeed under the indirect method of proof, we move on to the direct. Brewer's first argument here is that Hendricks subjected him to heightened scrutiny because he was black, observing that Hendricks frequently mentioned Brewer's race and in particular often noted that he was the first African-American male to hold the ILIR research assistantship at the PSO. But while superficially neutral comments about an employee's race might suggest racial animus in an incriminating context, *see, e.g.*, *Phaup v. Pepsi-Cola Gen. Bottlers, Inc.*, 761 F. Supp. 555, 564 (N.D. Ill. 1991), Brewer offers no reason to think Hendricks's comments were anything but positive. To the contrary, Hendricks said she "was excited to have a minority" in the assistantship (Brewer Dep. Ex. 14 at 2) and wanted to see minorities succeed (*Id.* at 7, 10). Brewer also claims that a later remark by Feuille that Brewer's poor performance had "ruined it for everyone else" indicates that Hendricks had decided to never again hire a black research assistant, but it would be pure speculation to conclude that the comment refers to race. (Brewer Dep. at 89.) Feuille was concerned that poor student performance might lead the PSO to discontinue the research assistantship program (as it eventually did, though apparently not because of Brewer). No jury could conclude that Hendricks was herself biased against Brewer because of his race.

This leaves Brewer's argument that the University violated Title VII because Thompson, acting for racial reasons, got Brewer fired by failing to reveal to Hendricks that she told Brewer he could park anywhere. Thompson's remarks to Brewer would clearly permit a jury to conclude that she acted as she did for racial reasons. *See, e.g.*, *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (distinguishing "stray remarks" from relevant racial comments). Thompson did not "discharge"

Brewer, so no liability could arise on that score. 42 U.S.C. § 2000e-2(a)(1). But Title VII also prohibits "discriminat[ing] against any individual with respect to his terms, conditions, or privileges of employment." *Id.* Courts limit that language to reach only material, sufficiently important alterations of the employment relationship (often referred to as "adverse employment actions"). *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006); *see also O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (listing types of "adverse employment actions" that can give rise to a Title VII violation).

   In and of itself, whether other employees speak ill or spread rumor about one is not a very important aspect of one's employment, so long as such behavior is not severe or pervasive. *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 731 (7th Cir. 2004); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996). But in the right context—a performance review, for instance—what one employee says or doesn't say about another will control an employee's wages and chances for promotion, or may even get an employee fired. Consequently, we have held that where an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment nonetheless uses her "singular influence" over an employee who does have such power to harm the plaintiff for racial reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII. *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 613 (7th Cir. 2005), *citing Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000). In some situations, the influence can be exercised by supplying misinformation or failing to provide relevant information to the person making the employment decision. *See, e.g.*, *David v. Caterpillar, Inc.*,

324 F.3d 851, 861 (7th Cir. 2003); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997).

In the present case, a jury could conclude that Thompson withheld relevant information from Hendricks, and as a result had some influence over Hendricks's decision to fire Brewer. A jury would have trouble doing so if it chose to believe Brewer's account of the parking scandal. Thompson could have told Hendricks that Brewer's modification of the parking tag was an honest mistake, but according to Brewer Hendricks did not fire him because he was dishonest or broke the parking rules. Indeed, the PSO itself was cheating University parking services out of a thousand dollars a year. Hendricks fired Brewer simply because someone had to be fired to keep parking services from looking too closely at the PSO's tag applications. Brewer was the natural choice: the incriminating parking tag was his, and as a student research assistant the PSO would have to replace him in a few months anyway. Given the cynical but non-racial motive Brewer ascribes to Hendricks it was irrelevant where Thompson told Brewer to park, and Thompson's failure to reveal the facts did not affect Hendricks's decision.

Ironically, the jury could find Thompson affected the decision if it believed *Hendricks's* version of events. Hendricks claims she fired Brewer for dishonestly altering his parking tag and suggested that she might have changed her mind if the alteration were an honest mistake. The jury could believe that the alteration was an honest mistake, that Thompson knew it and that she failed to tell Hendricks. If that is the case, Thompson had influence over Brewer's firing; if she had talked, it might not have happened.

But it is not enough just to have some minimal amount of influence; did Thompson have the "singular influence" required by *Rozskowiak*? For a nominal non-decision-

maker's influence to put an employer in violation of Title VII, the employee must possess so much influence as to basically be herself the true "functional[ ] . . . decision-maker." *Little v. Ill. Dept. of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004). The nominal decision-maker must be nothing more than the functional decision-maker's "cat's paw." *Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990). A good example of such a degree of influence (and one which will offer a revealing comparison to the present case) is where the party nominally responsible for a decision is, by virtue of her role in the company, totally dependent on another employee to supply the information on which to base that decision. In such a case the employee that selects, colors and supplies the information has such power over the nominal decision maker that she is in fact the true, functional decision maker. Mere "paper review" of the informer's recommendation will not shield the employer from liability if her recommendation is racially motivated. *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993); *see also David*, 324 F.3d at 861 (holding that liability can be based on the bias of employees who have the duty to recommend other employees for promotion, where the decision maker said he "received the necessary information" for decisions from those recommending employees); *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 387 (7th Cir. 2000) (describing "perfunctory" review by an internal committee that asked limited questions of the recommender and suggesting that the committee was "a liability shield invented by lawyers"); *Shager*, 913 F.2d at 403 (describing "brief, perfunctory" deliberations of a committee "apt to defer to the judgment" of an employee's immediate supervisor in making employment decisions).

By contrast, where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the

decision, the employer is not liable for an employee's submission of misinformation to the decision maker. *Byrd v. Ill. Dept. of Public Health*, 423 F.3d 696, 708 (7th Cir. 2005); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (1997). It does not matter that in a particular situation much of the information has come from a single, potentially biased source, so long as the decision maker does not artificially or by virtue of her role in the company limit her investigation to information from that source. For instance, we have frequently dealt with employees that claim they were framed for misconduct by a racist co-worker or superior, which caused the employee in question to be fired. Even though the employer in such situations must often decide what to do based on nothing more than the conflicting stories of two different employees, the employer will not be liable for the racism of the alleged frame-up artist so long as it independently considers both stories. *Lucas v. Chicago Transit Authority,* 367 F.3d 714, 730 (7th Cir. 2004); *Alexander v. Wis. Dept. of Health and Family Servs.*, 263 F.3d 673, 685-86 (7th Cir. 2001); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 753 (7th Cir. 1998); *Willis*, 118 F.3d at 547-48.

In *Eiland,* for instance, the plaintiff nurse was fired after a staff physician reported that she injected a pregnant woman with a measles-mumps-rubella vaccine without following proper procedure. The plaintiff sued, claiming that the staff physician had racial animus against her and had made the report to get her fired. We held that even assuming the staff physician had made the story up, there had still been no violation of Title VII. The supervisor who fired her acted only after reading the staff physician's incident report, speaking with another supervisor and confronting the plaintiff herself with the allegations. The supervisor had thus "acted independently and only after she evaluated the circumstances, including [the plaintiff's] version." *Id.* at 753.

We confronted a similar situation in *Willis*, where the plaintiff Willis was fired after tardily processed invoices were repeatedly found in her files. 118 F.3d at 544-45. Willis claimed that her supervisor, Conklin, bore racial animus against her and had planted the invoices to get her fired. Conklin's supervisor, Mizen, sent Willis a memorandum requesting more detail or other information supporting her claims against Conklin. Willis did not provide any. She was reprimanded and eventually fired. *Id.* Willis sued, claiming that Conklin had violated Title VII by planting the files. We held that no rational jury could have found that Mizen acted as Conklin's "cat's paw" or "rubber stamp." Mizen's "proactive involvement" in investigating the circumstances surrounding the invoices, including a "serious[ ]" investigation of Willis's allegations, were sufficient to absolve the employer of liability for Conklin's frame-up. *Id.* at 547-48.

Brewer's case is not distinguishable from these cases in which an independent investigation absolves the employer of liability. Though Thompson, as Hendricks's assistant, might have effective control over some of Hendricks's decisions, the decision to fire Brewer was not one of them. Hendricks listened to the information Thompson relayed to her but did not simply rely on it. Instead, she examined the parking tag herself and confirmed that it had been altered. True, Hendricks did not investigate the possibility that Thompson was holding back relevant information, but according to Hendricks, and unlike in *Willis*, Brewer never claimed that Thompson was holding anything back. No one has suggested that Brewer was unable to bring such a claim to Hendricks's attention, and until he did so Hendricks had no reason to suspect that there were additional relevant facts that she had not investigated. *Cf. Farragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (holding that an employer is not liable for an employee's sexual harassment where the plaintiff

failed to take advantage of corrective opportunities, such as a complaint procedure); *Jackson v. County of Racine*, 474 F.3d 493, 502 (7th Cir. 2007); *Erickson v. Wis. Dept. of Corr.*, 469 F.3d 600, 604-09 (7th Cir. 2006). Hendricks therefore conducted an independent investigation that absolved the University of liability for any deception on Thompson's part.

Although Brewer has not brought the relevant cases to our attention, our approach to Title VII cases involving an employee's influence over a decision maker has not always been completely clear. Our opinions have sometimes suggested that not only significant influence, but any influence over an employment decision is sufficient to impose Title VII liability on an employer. Many such instances simply involve imprecise language. *See, e.g.*, *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 813-14 (7th Cir. 2007) (holding that a recommendation can "taint" multiple levels of administrative review); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994) (holding that a subordinate's discriminatory animus must "affect[ ]" the decision). But a few instances clearly involve more than loose language. For instance, *Lust v. Sealy* openly rejected the view that an employee's limited "influence" is "not enough to impute the discriminatory motives of the subordinate to the supervisor." 383 F.3d 580, 584 (7th Cir. 2004). "If [the decision-maker] would not have turned down [the plaintiff] for the promotion had it not been for [a nominal subordinate's] recommendation . . . then [the nominal subordinate's] sexism was a cause of [the plaintiff's] injury, whether or not [the decision-maker] could reasonably be thought a mere cat's paw." *Id.*

These dicta are doubtful. They are at odds with numerous cases in which we have upheld summary judgment despite a racist employee's potential but slight influence

over an employment decision. *See, e.g.*, *Rozskowiak*, 415 F.3d at 613 (upholding summary judgment where an allegedly biased employee was on a seven-member committee that recommended the plaintiff's firing); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003) (upholding summary judgment where two allegedly biased employees were members of an employee selection committee); *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754-55 (7th Cir. 2000) (upholding summary judgment where a biased manager was one of several managers reporting unfavorably on the plaintiff's work).

Even if we were to assume that a lesser degree of influence over an employment decision might trigger Title VII liability in other contexts, such as the context of a regularized, formal performance evaluation, we do not think that such an approach can affect the outcome in a case like this that concerns an employee's discipline for particular misconduct. The line of cases addressing this particular situation is univocal, and indicates that even where a biased employee may have leveled false charges of misconduct against the plaintiff, the employer does not face Title VII liability so long as the decision maker independently investigates the claims before acting.

Requiring only an independent investigation of misconduct charges makes good sense in light of the practical realities that an employer often faces when addressing such charges. Title VII is informed by traditional principles of agency law, *see* 42 U.S.C. § 2000e-2(a)(1)*, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754-55 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 791-92 (1998), but those principles should be applied in light of the practical reasons for imposing liability on employers. *Faragher*, 524 U.S. at 797; *see also Burlington Indus.*, 524 U.S. at 755 (holding that "common-law principles may not be transferable in all their particulars to Title VII"). Title VII's primary objective is "not to provide

redress but [to] avoid harm" by giving employers an incentive to control their employees. *Erickson v. Wis. Dept. of Corr.*, 469 F.3d 600, 605-06 (7th Cir. 2006); *see also Burlington Indus.*, 524 U.S. at 764 ("Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms."). Consequently, employers should be liable for their employees' racism only in "the general class of cases in which [an employer] has the practical ability to head off injury to [its] employee's . . . victim." *Shager*, 913 F.2d at 405. Imposing liability for employee wrongs that an employer could not practically prevent (that is, could prevent only with prohibitive expense or through unreasonable efforts) would not induce employers to impose additional controls on its employees and would therefore not be effective to avoid any harm.

In cases like the present one, there is probably no practical step an employer can take beyond independently investigating the misconduct charges that will reduce the chances of an employee's racism influencing its behavior. When an employee is accused of wrongdoing by another, the key evidence for an employer (and the courts) to consider will often be the mere say-so of two employees, one of whom claims the other is a lying racist. Such a case is a model "swearing contest." The best way the courts can find to deal with such puzzles is to empanel a jury and hope for the best; it might be too demanding to expect an employer to do more than have an employee conduct a fair-minded, independent investigation into the available evidence and then make a decision in good faith.

Title VII's agency principles do not counsel in favor of imputing Thompson's acts to the University where the University has investigated the claim that Brewer dishonestly modified the parking tag, including all arguments

Brewer made to the University that his mistake was innocent (according to Hendricks's account, he made none), and has otherwise taken all reasonable steps to prevent Thompson's actions from affecting Brewer's employment. A reasonable jury could not find that the University intentionally discriminated against Brewer in firing him from the PSO, and summary judgment on this claim was appropriate.

### B. Title VI: Termination from the ILIR Master's Degree Program

Second, Brewer claims that he was dropped from the ILIR master's program because of his race, in violation of Title VI of the Civil Rights Act of 1964. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The master's program was receiving federal money, so to avoid summary judgment Brewer must present evidence sufficient to permit a reasonable jury to conclude that the University dropped him for a racial reason. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (holding that Title VI prohibits only intentional discrimination); *City of Chicago v. Lindley*, 66 F.3d 819, 828 (7th Cir. 1995) (same). Brewer seeks to use both the indirect and direct methods of proof.

### 1. Indirect Method of Proof

Under the indirect method, Brewer contends that the circumstances surrounding his termination constitute a prima facie case that Director Feuille acted for racial reasons. The elements of a prima facie case are the same under both Title VI and VII. *Paul v. Theda Medical Ctr.,*

*Inc.*, 465 F.3d 790, 794 (7th Cir. 2006); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998). Adjusting terms for the educational context, that means membership in a protected class, meeting the school's legitimate educational expectations, an adverse educational action and worse treatment than that of similarly situated students not in the protected class. *Byrant v. Independent Sch. Dist. No. I-38 of Garvin County, OK*, 334 F.3d 928, 930 (10th Cir. 2003); *Hankins v. Temple Univ. (Health Sciences Ctr.)*, 829 F.2d 437, 440-43 (3d Cir. 1987).

Brewer's case again falls apart because of a failure to locate a similarly situated individual. Brewer had a cumulative GPA of 2.959 after two semesters, meaning that he had to be dropped from the program absent extraordinarily compelling circumstances. Most of the faculty could not remember any time when a student with numbers like Brewer's was retained in the program. Director Feuille vaguely remembered a time that an Asian-American student with a below-3.0 GPA was retained because of extraordinarily compelling circumstances, namely that her GPA was caused by her reliance on the "advice of a faculty member about, all right, if you do A and B, then you'll be okay. Well, she did A and B. I don't remember what A and B were." (Feuille Dep. at 33.) Brewer claims that he is similarly situated to this student because his GPA was caused by Professor LeRoy's permission to take five courses. But although LeRoy was Brewer's "advisor," he did not advise Brewer to take five courses. No one did; on the contrary, everyone warned him that taking five courses was unusual and dangerous. The distinction is obviously relevant to the decision whether to permit Brewer to remain in the program. *Hull*, 445 F.3d at 952. In one case, the student is misled and unfairly deprived of an informed chance to complete the program; in Brewer's case, the student is adequately warned of the risks of his course of action (inadequate time to study the material),

and then seeks to be excused from the consequences (ignorance of the material and bad grades) when the risk comes to pass.

Brewer also contends he is similarly situated to the Asian-American student in that her GPA was the result of mistaken advice and his termination was the result of Hendricks's mistaken belief that Brewer's alteration of the parking tag was not innocent (remember, Brewer claims that Feuille would not have dropped him were it not for the parking fiasco at the PSO). The two "mistakes" are obviously nothing like one another, and the mere fact that one can use the highly flexible, amorphous term "mistake" to refer to both does not make the role they would play in a termination decision any more alike. Brewer has not made out a prima facie case.

### 2. Direct Method of Proof

Brewer also contends that he has met his burden of production without the aid of the burden-shifting analysis. His chief argument is parasitic on his Title VII firing claim: Feuille terminated him because of what Hendricks told him about the PSO firing, and that as Thompson's racism infected Hendricks's decision, so it infected Feuille's. But the argument fails for the reasons already noted in connection with the Title VII claim based on the PSO firing: Hendricks's independent investigation of the parking scandal absolved the University of any liability for Thompson's misleadingly incomplete information. It may have been against University policy for Feuille to consider Brewer's PSO work in deciding whether or not to retain him in the program, but Title VI does not create liability for any decision that violates a University policy, only for decisions that violate Title VII's policy against racism. We have frequently remarked that we are not a super-personnel board charged with evaluating the general

quality of employment decisions, *see Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006), and we are equally not a super-enrollment committee. A jury could find no racism here.

Brewer has another argument, not parasitic on his Title VII claim but similar to it, that Thompson's misleading portrayal of and attempts to sabotage his PSO work drove down his Fall 1997 grades and rendered him eligible to be dropped by Feuille a semester later. Brewer received word that two of his Fall grades were adversely affected by the events at the PSO, and claims that a reasonable jury could conclude that if it weren't for Thompson's racist desire to ruin him his cumulative GPA by the end of the Spring 1998 semester would have been above 3.0, the program's minimal requirement.

As this argument is similar to his Title VII argument, however, it again fails for the same reason: while Thompson may have had some influence over Brewer's Fall 1997 grades, she did not have the singular degree of influence required to make her functionally responsible for Brewer's grades. *Rozskowiak,* 415 F.3d at 613; *Little*, 369 F.3d at 1015. Her meddling at the PSO was at best only a slight input into Brewer's Fall 1997 grades (among other important factors would be the professors' evaluation of the quality of Brewer's work throughout the semester), and Thompson's influence over events at the PSO itself was only partial. This limited influence is not enough to subject the University to liability for Thompson's actions. *Rozskowiak*, 415 F.3d at 613; *Cerutti*, 349 F.3d at 1063.

Finally, Brewer again argues that neutral or positive references to Brewer's race, as well as Feuille's comment about how Brewer had "ruined it for everyone else," show that black students were held to a higher standard than other students, but again the argument fails because Brewer provides no suspicious context from which a

reasonable jury could conclude that the neutral or positive references to race in fact masked negative racial attitudes. He also points to some non-rigorous statistical evidence that he suggests shows a history of racist enrollment decisions at the ILIR, but it does not without more add up to a picture that could convince a reasonable jury of racism. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 398, 399-400 (7th Cir. 1998). The district court was correct to grant summary judgment on Brewer's Title VI claim.

## C. Title VII Retaliation: Communications From the PSO to the ILIR

Brewer's final claim is that Hendricks and others at the PSO violated Title VII by making "vague, inaccurate and unfavorable communications" to ILIR faculty in retaliation for his complaints about Thompson's racism. Title VII makes it unlawful for an "employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Brewer seeks to proceed only under the indirect method of proof. To do so, Brewer must first make out a prima facie case of retaliation by showing that (1) he complained about Thompson's racism, (2) he was subjected to an adverse employment action, (3) he was meeting the PSO's legitimate performance expectations, and (4) he was treated worse than a similarly situated employee that did not complain of discrimination. *Little,* 369 F.3d at 1011; *Rogers v. City of Chicago*, 320 F.3d 748, 754-55 (7th Cir. 2003).

Brewer's claim is a little mysterious. According to what Brewer claims both Thompson and Hendricks told him, Brewer only complained to Hendricks about Thompson's racism after Hendricks had already told the ILIR about the parking scandal and her decision to fire Brewer. It seems

doubtful, therefore, that any later "vague, inaccurate and unfavorable communications" could have critically affected Brewer's reputation. (He apparently also earlier complained to another employee, Ron Bacevich, about Thompson, but he has not briefed this possible complication. At any rate Bacevich appears to have been on good terms with Brewer and may not have told others about his complaints, making it again unclear how Brewer's complaints could have given rise to critically damaging communications to the ILIR).

But at any rate, we need not worry about the strange details of Brewer's claim because he has again failed to show he was treated worse than a similarly situated employee. Here, Brewer does not even contend that he was treated worse than a similarly situated employee, but argues that he does not have to do so to make out a prima facie case, observing that the *Rogers* court stated that a plaintiff must show that "only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action." *Rogers*, 320 F.3d at 754. While that sentence might plausibly be read to favor Brewer's position, the court went on to make it clear that it is the plaintiff's duty to identify a similarly situated employee who was better treated. *See id.* at 755-56 ("When plaintiffs proceeding under the burden-shifting formula of *McDonnell Douglas* cannot produce competent evidence that they were treated differently than similarly situated employees, we must affirm the granting of summary judgment on that basis."); *see also Little*, 369 F.3d at 1012 ("As noted above, to put forth a prima facie case of either racial discrimination or retaliation, Little must show, among other things, that he was treated differently than a similarly situated employee who was not in the protected class."). Brewer has not identified any similarly situated employee, and his final claim must fall.

### III.  Conclusion

Brewer has presented evidence that could permit a reasonable jury to conclude that his academic career at the University of Illinois failed for reasons other than his academic merit, indeed that it failed in part because of the racism of an employee of the Personnel Services Office. But he has not presented evidence that the University did not take reasonable steps to avoid the effect of that racism or otherwise violated federal civil rights law. Consequently, we affirm the judgment of the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*