NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 4, 2008
Decided March 19, 2008

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

No. 07-2241

CLASSIC ALEXANDER,
    *Plaintiff-Appellant*,

    *v.*

BIOMERIEUX, INC.,
    *Defendant-Appellee*.

Appeal from the United States District Court for
the Northern District of Illinois, Eastern
Division.

No. 06 C 1531

Charles R. Norgle, Sr.
*Judge*.

**O R D E R**

In October 2004 and January 2005, Classic Alexander—a packing technician at bioMerieux Inc.'s facility in Lombard, Illinois—complained to a manager that she was being discriminated against because she is black. In February 2005, the same manager received a report that Alexander had threatened to bring a gun to work if people there kept "messing with" her. Alexander was suspended the next day, and shortly thereafter she was fired. Alexander sued bioMerieux under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 and 42 U.S.C. § 1981, alleging retaliation. In response to bioMerieux's motion for summary judgment, Alexander argued that bioMerieux employees fabricated the gun threat to retaliate against her for complaining about discrimination. The district court granted bioMerieux's motion. Because Alexander has not raised a genuine issue of fact from which a jury could infer that her termination was an act of retaliation, we affirm.

The following facts are construed in the light most favorable to Alexander. In 1995 Alexander began working as a packing technician at bioMerieux's Lombard facility. At that facility, bioMerieux produces petri dishes used for environmental testing. Alexander's duties included packing products into boxes and cleaning. Alexander liked her job and felt comfortable at bioMerieux until the fall of 2004, when the company combined its packing and production departments and began cross-training employees to work in both. Alexander admits that she was unhappy with this change, and some of her coworkers began to perceive her as being upset and behaving strangely—for example, talking to herself.

Alexander's supervisor during the cross-training was Ilona Glaz, a white woman who, according to Alexander, treated her differently than her white coworkers and at some point said "black people are ignorant." After telling Glaz that she thought Glaz was biased against her based on her race, in October 2004 Alexander complained to her manager, Rick Badea, that Glaz was discriminating against her. When Badea asked for examples, Alexander said only that Glaz laughed at her, would not speak to her directly, and treated her differently than other employees. She did not tell Badea that Glaz had said that "black people are ignorant." Badea told Alexander that she could discuss the allegations with his boss, Tony Donovan, and he called Tamarah Wagner—a human resources representative who worked in St. Louis, Missouri—to report Alexander's allegations. Wagner left two messages on Alexander's cell-phone voicemail asking to discuss the allegations, but Alexander never returned the calls.

In January 2005 Alexander again met with Badea to complain that Glaz was discriminating against her because of her race. She reiterated her feeling that she was being treated "different from the rest" and said that Glaz laughed at her and would talk to her "through other people" rather than directly. Alexander again did not tell Badea, nor did she ever tell any other bioMerieux manager, that Glaz had said "black people are ignorant." After this second meeting Alexander met with Donovan—Badea's boss—at Donovan's request. When Donovan asked whether she had complained of discrimination, Alexander said no, but she also said that she was "being treated unfair." Donovan asked whether Alexander planned to sue bioMerieux, and she said she was not planning to, but that "he would be the first to know." A couple of days later, Donovan met with Glaz to discuss Alexander's concerns.

On January 27, 2005, Badea gave Alexander a positive performance review. But on February 7th and 8th, Glaz complained to Badea that Alexander's performance was "not up to par" and that she was "creating a frustrating environment" for the other employees.

On February 9th or 10th, Alexander's coworkers Pat Yattoni and Nell Kozmic told Glaz that another coworker, Susanna Henney, had told them that she overheard Alexander say, "if they keep messing with me, I'll bring a gun." The same day, Glaz—who later testified that she was concerned about the alleged threat because she thought Alexander was unhappy and exhibiting "strange behavior"—reported the gun remark to Badea. Glaz told Badea that she had heard about the alleged threat from three people and that she did not want to reveal their names. Right away Badea had Glaz repeat the statement to Donovan. Donovan pressed Glaz to provide the names of the employees who had reported the threat, and she said she heard it from Yattoni

and Kozmic. Donovan became very concerned and he, along with Badea, called Wagner at the human resources department in St. Louis.

After discussing the allegations, on February 10th Wagner and Donovan agreed that Alexander should be suspended. The same day, Donovan and Badea met with Alexander in person and informed her of the suspension.

On the same day that Alexander was suspended, Wagner began to investigate the gun-threat allegations. She conducted phone interviews with Henney (the employee who allegedly heard Alexander make the threat), Glaz, and two of Alexander's coworkers—Arlene Bartys and Vertie McCoy. Bartys told Wagner that after Alexander was moved to the packaging department she had become aggressive and had begun talking to herself. McCoy told her that Alexander said things to herself like "I'll show them." After discussing the gun-threat allegation with Henney, Wagner decided that she believed that Henney was telling the truth. In her investigation notes Wagner wrote that Glaz reported during their interview that Alexander had complained that Glaz was discriminating against her. Wagner did not interview Alexander during her investigation, nor did she interview Yattoni or Kozmic—the employees who reported the alleged threat to Glaz.

The parties disagree as to who made the final decision to fire Alexander. Wagner testified that she conferred with bioMerieux's human resources director, Laura Villa, about how to proceed, and together they called John Medinger, the vice-president of human resources, to discuss the gun-threat allegation. Villa and Medinger both testified that Medinger had the final authority over termination decisions. Wagner, Villa, and Medinger all testified that during the February 10 phone call, Wagner reported that Henney confirmed that she heard Alexander threaten to bring a gun to work. They also discussed Alexander's coworkers' reports that she had been acting strangely. According to Medinger, he concluded during this discussion that Alexander had probably made the comment and that the best way to ensure the safety of bioMerieux's employees was to fire her. Wagner and Villa concurred in this decision. After the decision was made, Villa and Wagner called Donovan and Badea, and they, too, agreed that Alexander should be fired.

According to Alexander, it was not Medinger, but Wagner, Badea, and Donovan, who made the final decision to fire her. In support of this position Alexander cites the position statement that Villa submitted to the Illinois Department of Human Rights (IDHR) three months after Alexander was fired, in response to Alexander's discrimination claim. In that statement Villa wrote that "Mr. Donovan, Mr. Badea, and Ms. Wagner concluded that Complainant's at-will employment should be terminated."

In any event, the parties agree that on February 11, Wagner called Alexander and told her that her employment was being terminated. The same day, Wagner wrote Henney to confirm that she was being promoted to a position for which she had interviewed a few days earlier.

In March 2006 Alexander sued bioMerieux, alleging that she was terminated based on her age and her race, and in retaliation for complaining about age and race discrimination. In its motion for summary judgment, bioMerieux argued that there was no genuine issue of material of fact that could lead a jury to believe that discrimination or retaliation—and not her alleged threat to bring a gun to work—was the reason that Alexander was fired. The district court granted summary judgment for bioMerieux, finding that Alexander had not put forth evidence sufficient to support her claims of discrimination or retaliation under either the direct or indirect methods of proof.

On appeal Alexander has abandoned her race and age discrimination claims, but she argues that she has submitted evidence sufficient to support her retaliation claim. Specifically, she argues that the record supports an inference that bioMerieux fired her to retaliate against her for complaining of race discrimination and not because it believed she threatened to bring a gun to work. Alexander is proceeding under the direct method, which requires her to present evidence of a statutorily protected activity, an adverse employment action, and a causal relationship between the two. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). The parties agree that Alexander has met the first two elements, but they disagree as to whether she has shown a causal relationship between her discrimination complaints and bioMerieux's decision to fire her. Even if Alexander shows a causal relationship, bioMerieux will still prevail if it can prove that it would have fired her regardless of her discrimination complaints. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 485 (7th Cir. 2004). In other words, even if bioMerieux "harbored retaliatory animus" against Alexander, it is entitled to summary judgment if no reasonable jury could infer that Alexander would not have been fired but-for that animus. *See Merheb v. Ill. State Toll Highway Auth.*, 267 F.3d 710, 714 (7th Cir. 2001).

Alexander argues that she has submitted enough circumstantial evidence from which a jury could infer that bioMerieux fabricated the story about the gun threat as an excuse to get rid of her for complaining about race discrimination. According to Alexander, her circumstantial evidence includes (1) the close temporal proximity between her discrimination complaints, Glaz's complaints about her performance problems, and the gun-threat allegations; (2) the supposedly "sham investigation" that Wagner and other employees conducted after learning of the alleged threat; and (3) numerous examples of what Alexander calls bioMerieux's "mendacity."

Before examining Alexander's circumstantial evidence, we note that in order for the jury to accept Alexander's retaliation theory, it would have to believe that Glaz and Henney concocted the gun threat and that Badea and Donovan knew this but jumped on the chance to pass along the lie so they would have an excuse to fire Alexander. It would also have to believe that during their depositions Henney lied about hearing the threat, Yattoni and Kozmic lied about Henney recounting the threat to them, and Wagner lied about believing that the threat was real. It would also have to believe that Medinger and Villa—the vice-president and director of human resources, respectively—lied when they testified that they, too, believed the threat was real and that Medinger made the final decision to fire Alexander. Moreover, the jury would have to

overlook Alexander's testimony that she had no information suggesting that the gun threat was not the real reason she was fired or that anyone at bioMerieux retaliated against her. Thus, the jury would have to believe that at least eight bioMerieux employees agreed to lie about the gun threat when Alexander herself has said she does not think they are lying.

Although she has no direct evidence that any of the bioMerieux employees lied, the strongest circumstantial evidence in Alexander's favor is the timing of the relevant events. The alleged gun threat emerged within three weeks of Alexander's second complaint to Badea about discrimination as well as her meeting with Donovan where he asked if she planned to sue bioMerieux. Glaz reported the gun threat to Badea just one day after she had complained to him that Alexander was supposedly "creating a frustrating environment" for the other employees. And on the same day Wagner wrote Alexander's termination letter she also wrote a promotion letter for Henney—the person who allegedly overheard the threat. Alexander argues that a jury could infer from this timing that Glaz conspired with Yattoni and Kozmic—the employees who reported the threat—to fabricate the gun story because she realized that Badea otherwise was not going to fire Alexander. She also argues that a jury could infer that Badea, Donovan, and Wagner knew about the conspiracy and promoted Henney to reward her for lying.

The timing of these events could be deemed suspicious, and suspicious timing is "'often an important evidentiary ally of the plaintiff.'" *See Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004)). But "suspicious timing alone rarely is sufficient to create a triable issue," *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005), and here, the effect of the timing is at least partially mitigated by the positive performance review that Badea gave Alexander *after* she complained about discrimination. Moreover, because the timing here is suspicious only if a jury can infer that several bioMerieux employees agreed to lie about the gun threat, this is not the rare case where timing alone is enough to justify a trial. Accordingly, Alexander must have "other evidence that supports the inference of a causal link" to survive summary judgment. *See Culver*, 416 F.3d at 546.

As additional evidence of the purported conspiracy, Alexander points to what she characterizes as the bioMerieux's managers' "implausible" responses to the alleged gun threat. According to Alexander, it is "implausible" that when Glaz first heard about the threat from Kozmic and Yattoni she went straight to Badea, who reported it straight to Donovan, who immediately called Wagner. Alexander claims that if the managers had pure motives they would have done more to investigate the seriousness of the threat before reporting to their bosses. But there is nothing implausible in their decisions to report the allegation straight up the chain of command, especially because it was the role of human resources—not the managers—to investigate employee misconduct. We have noted that this court is "not a super-personnel board charged with evaluating the general quality of employment decisions," *see Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 922 (7th Cir. 2007), and that is the precise form of second-guessing that Alexander's "implausibility" arguments require.

Alexander's characterization of Wagner's subsequent investigation as a "sham" requires the same impermissible second-guessing. According to Alexander, a jury could infer that the investigation was fraudulent because Wagner did not interview Alexander or Kozmic and Yattoni (the employees who reported the threat); ignored the managers' supposed motive to lie; and needlessly rushed to complete her investigation. But again, there is nothing about Wagner's actions that permits a reasonable inference that the investigation was a sham. Wagner interviewed Henney—the only person who heard the threat directly—and Alexander does not dispute that Wagner did not interview the perpetrator during her only other investigation into alleged workplace violence. Moreover, speculating about how long it would take to conduct a "real" investigation puts Alexander right back in the position of second-guessing the quality of an employer's decisions. Such speculation does not amount to circumstantial evidence of retaliation. *Cf. Brewer*, 479 F.3d at 922 (noting that the court does not evaluate the "quality of employment decisions"); *Moser*, 406 F.3d at 905 (noting that speculation is insufficient to suggest a causal link between protected activity and an adverse employment decision).

Alexander next asserts that bioMerieux has given shifting explanations of who decided to fire her, because, according to her, bioMerieux originally claimed that Badea, Donovan, and Wagner made the decision to fire her, and that the company is now lying by claiming that Medinger made the decision. As support she points to bioMerieux's IDHR response which states that "Mr. Donovan, Mr. Badea, and Ms. Wagner concluded that Complainant's at-will employment should be terminated." But Villa testified, and Wagner confirmed, that the statement was "not completely accurate" because although Donovan, Badea, and Wagner agreed that Alexander should be fired, it was Medinger's role to make the final decision. Medinger provided a declaration confirming his role as the final decisionmaker and stating that he in fact decided to fire Alexander. The IDHR response does *not* say that Donovan, Badea, and Wagner made the final decision, and thus there is no inconsistency that would suggest bioMerieux is lying. And in any event, bioMerieux had no reason to lie. We have held that "the retaliatory motive of a 'nondecisionmaker' may be imputed to the company where the 'nondecisionmaker' influenced the employment decision by . . . feeding false information to, the ultimate decisionmaker." *See David v. Caterpillar, Inc.*, 324 F.3d 851, 860-61 (7th Cir. 2003). Accordingly, if Badea, Donovan, and Wagner were lying about the gun threat, their retaliatory motive could be imputed to bioMerieux regardless of whether they or Medinger made the final decision.

Alexander also asserts that bioMerieux "changed the basis" for her termination, but her reasoning on this point is equally flawed. According to bioMerieux, it fired Alexander because she threatened to bring a gun to work, thereby violating its strict policy against employees "making threats or engaging in violent acts." But Alexander claims that Wagner gave a different explanation in her deposition when she testified that even if there was some uncertainty about whether Alexander made the threat, Wagner probably would not have recommended that she keep her job in light of the other employees' concerns and fears. According to Alexander, this testimony reveals a "shifting explanation." But again, there is nothing inconsistent about Wagner's statement about what she might have done under different circumstances and bioMerieux's position that it actually fired Alexander because the decisionmakers believed

she threatened to bring a gun to work. Wagner testified, consistent with bioMerieux's position, that she believed that Alexander *did* make the gun remark.

Finally, Alexander points to numerous instances of what she characterizes as bioMerieux's "mendacity" to support her theory that Yattoni, Kozmic, Henney, Glaz, Badea, Donovan, Wagner, and Medinger are all lying about her alleged threat to bring a gun to work. For example, Alexander asserts that Henney said she only told Yattoni about the threat, while Kozmic said that Henney told her about it as well. But this assertion is simply not supported by the record—Henney testified that she *did* tell Kozmic about the threat. Alexander also asserts that Wagner testified that she interviewed Henney during the investigation, while Henney said she did not talk to Wagner until after Alexander was fired. But the record demonstrates that Henney thought Alexander was fired on the day she was escorted out of the facility—the same day that Wagner conducted her investigation. Thus, the only reasonable conclusion is not that Henney was lying about when Wagner interviewed her, but that she was mistaken about when Alexander was fired. The remainder of the purported inconsistencies are all similarly unsupported by the record or are simply immaterial. They certainly are not sufficient to permit a reasonable juror to infer that eight bioMerieux employees conspired to retaliate against Alexander and then committed perjury to conceal their retaliatory intent.

Viewing the record in the light most favorable to Alexander, the only circumstantial evidence of retaliation is the timing of her termination and a few immaterial contradictions among the employees' testimony. Upon this thin foundation Alexander rests her theory that several bioMerieux employees, managers, and human resources personnel either lied about Alexander's threat or knowingly turned a blind eye to that lie. Circumstantial evidence requires a long "chain of inferences," and it is only "if each link is solid" that it suffices to create a genuine issue of fact for trial. *See Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). Especially in light of Alexander's admissions that she does not have any knowledge that her termination was a retaliatory act, no reasonable juror could conclude that the links in her circumstantial evidence are solid enough to support the conspiracy theory described in her briefs. Accordingly, we affirm the district court's grant of summary judgment for bioMerieux.